# BALTIMORE AND OHIO RAILROAD COMPANY *vs.* JOHN WATERS.

*Right of the Baltimore & Ohio R. Co. to Construct Lateral Roads— Invalidity of the Act of 1906, ch. 457, Prohibiting Construction of Railroad in a Designated Territory—Police Power.*

When the charter of a railroad company give to it full power to construct lateral roads in any direction whatever, the company is authorized to construct branch or lateral roads starting from some point on its line for the transportation of passengers or freight to and from places not reached by the main route, or for the purpose of making a connecting loop with other railroads.

The charter of the Baltimore and Ohio R. Co.—Act of 1826, ch. 123— authorized it to construct a railroad from the city of Baltimore to some point on the Ohio River, and provided that the company may make lateral railroads in any direction whatever in connection with said railroad. Ample power of condemnation was conferred. The main line was completed in 1853. In 1906 the railroad company determined to build a cut-off or lateral road, forty miles in length. from its main line, along a route to the north of the city of Baltimore, to connect with its Philadelphia branch, for the accommodation of traffic passing east and west and not designed for the city of Baltimore. Upon a bill by the owner of property through which the proposed road would pass to

restrain the construction of the same. *Held*, that the cut-off or loop designed to be built is a lateral road within the meaning of the charter of the railroad company, which it was thereby authorized to make.

The Act of 1906, ch. 457, declared that it should be unlawful for any railroad company to lay tracks within a described portion of Howard and Baltimore Counties. This territory, except in the immediate vicinity of two villages, is a rural district of farms and woodland, sparsely settled. *Held*, that the Act is invalid in so far as it restricts the right of the Baltimore and Ohio R. Co. under its charter, granted in 1826 and an irrepealable contract, to build lateral roads passing through the described territory.

*Held*, further, that the Act of 1906 is not valid as a police regulation designed to protect the public health, safety or morals, but it was enacted in the interest of property owners adjoining the line of the proposed lateral road in said territory, and since it is substantially an amendment of the charter of the Baltimore and Ohio R. Co., in curtailment of the franchises thereby granted, the Act impairs the obligation of that contract.

*Decided April 3rd, 1907.*

Appeal from the Circuit Court of Baltimore County (DUN-CAN, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*W. Irvine Cross* and *John G. Wilson* (with whom was *W. A. Parker* on the brief), for the appellant.

*Edgar H. Gans* and *W. Calvin Chesnut*, for the appellee.

PEARCE, J., delivered the opinion of the Court.

The Baltimore and Ohio Railroad Company was chartered by ch. 123 of the Acts of Assembly in the year 1826, and by the fourteenth section of that Act the president and directors of said company were "invested with all the rights and powers necessary to the construction and repair of a railroad from the city of Baltimore to some suitable point on the Ohio river, to be by them determined, not exceeding sixty-six feet wide, and with as many set of tracks as the said president and directors, or a majority of them may deem necessary; and in the same

section it was enacted "that they, or a majority of them, may make or cause to be made, lateral railroads, *in any direction whatsoever*, in connection with said railroad from the city of Baltimore to the Ohio river, and in the construction of the same, or their works, shall have, possess, and may exercise, all the rights and powers hereby given them in order to the construction or repair of the said railroad from the city of Baltimore to the Ohio river."

Section 15 of the charter conferred upon the corporation ample powers of condemnation to be exercised "for the construction or repair *of any of said roads, or of any of their works*," and in sec. 23, the concluding section of the charter, it was provided, "That full right and privilege is hereby reserved to the citizens of this State, or any company hereafter to be incorporated under the authority of this State, to connect with the road hereby provided for, any other railroad leading from the main route to any part or parts of this State, provided, that in forming such connection, no injury shall be done to the works of the company hereby incorporated."

The terminus upon the Ohio river was subsequently fixed at Wheeling then in Virginia, and the road was completed to that point and opened for business January 1st, 1853.

In April, 1906, the president and directors of this company, in pursuance of the authority conferred in section fourteen of its charter, determined to build a lateral railroad in connection with its railroad from the city of Baltimore to the Ohio river, from a point on its main line at or near Gorsuch Station in Carroll County, Maryland, through Baltimore County, and a portion of Harford County, to a connection with the Philadelphia Branch of the Baltimore and Ohio Railroad, between Van Bibber and Sewells Stations, to be known as the Patapsco and Susquehannah Branch of the Baltimore and Ohio Railroad Company, and have surveyed, located, and adopted the route or line of the same which is approximately forty miles in length, and passes several miles to the north of the city of Baltimore, effecting a saving of thirteen and a half

miles over the present line through the city of Baltimore, and relieving the congestion of freight and passenger traffic now passing through the tunnel from Camden Station to Mount Royal Station, and the tunnel beyond Mount Royal Station.

The descent over the main line from Gorsuch to the city of Baltimore, and the ascent over the Philadelphia Branch to Sewells, are by grades of about eight-tenths of one per cent, while by the proposed lateral line, the grades will be much lower and more even, being about three-tenths of one per cent for east bound traffic and five-tenths of one per cent for west bound traffic, the latter grade being higher, because the west bound freight is lighter and many cars returning are empty. This proposed lateral road runs through a tract of land in Baltimore County near Pikesville belonging to the appellee, and the appellant having taken the necessary steps to condemn the strip of land required for passage through said tract, the appellee filed a bill to enjoin the condemnation proceedings alleging that the defendant cannot exercise the power of condemnation "for constructing a steam railroad on the property of the appellee, not only because it is expressly prohibited from so doing by the Act of 1906, ch. 457, but also because the defendant has no such power under its charter, the said proposed road not being a lateral road within the meaning of the charter when properly construed."

The defendant answered fully, averring that the proposed road is a lateral road within the meaning of its charter, and denying that the Act of 1906, ch. 457, is effectual to forbid the construction of the road. Testimony was taken, and after argument, the Circuit Court for Baltimore County perpetually enjoined the further prosecution of the condemnation proceedings, and from that decree this appeal is taken.

In the opinion filed with the decree, the learned Judge of the Circuit Court reached the conclusion that the proposed road was not a lateral railroad authorized by the charter to be built, and therefore did not find it necessary to consider the other question raised in the case, and we shall follow this order of inquiry.

The considerations which controlled the view of the Court below may be best stated in extracts from his brief but clear opinion.  He found from the testimony of the president and general manager of the company that the proposed line "was intended to relieve the congestion in the freight yards and at the tunnels in the city of Baltimore, by running freight trains from the west over it, *intended for the east,* and running freight trains over it from the east, *intended for the west, so that western and eastern freight,* now passing through the city, will pass around it.    *    *.    *    The charter of the Baltimore and Ohio R. R. Co., Act of 1826, ch. 123, was very liberal to the railroad, but it was intended to be, and was, a Maryland and Baltimore railroad; Baltimore was then, as now, the great metropolis of the State, and it was intended by the Legislature that this road should make Baltimore greater.    It was the one shipping port of the State of any importance, and the lawmakers at that time guarded with great caution its commerce, and a suggestion at that time that the freight to be carried over the B. & O. Railroad for export would be shipped via Philadelphia or New York, would no doubt have been regarded as treasonable.    The lawmakers at that time were not afraid that the freight over its line from the Ohio river to Baltimore would be diverted to some other port for export, for the reason that there were no other railroads to carry it.    *So that* the power to build lateral railroads was a power to build branches to carry out the purpose for which the main line was built, towit, to develop the State, and make of Baltimore a great commercial city.    In other words, a lateral road as then understood, was, in the definition given by Bouvier; 'a branch road running from some point on the main line, intended as a connecting line or feeder.'    There seems to be no legal straight edge to lay upon a railroad charter granting the right to build lateral lines (between its termini) to determine just what branches may be built under it.    Every such charter must be considered alone, and what might be regarded in one, as a lateral branch, might not be interpreted as such in another.    So that if the intention of the Legislature granting the charter can

be fairly gathered from the grant itself, or from the history of the corporation from its beginning, that intention should control the Court in deciding upon what is a lateral branch that may be built under the charter. Any branch, therefore from the main line that is not a feeder of the *port* of Baltimore, is not a lateral railroad as contemplated in the charter of 1826. * * * I do not believe from the evidence that the proposed branch will be a feeder of the main line between Baltimore and the Ohio river, as was intended by the Legislature at the time of the grant, *a feeder for the commercial development of the port of Baltimore.* Being of the opinion therefore it is not a lateral railroad authorized by the charter to be built, it is unnecessary for me to go into the second question raised by the pleadings."

Turning now to the charter itself, with a view to determine how far its language sustains the meaning and purpose attributed to it by the Court below, a controlling, if not an exclusive, purpose to develop the *port* of Baltimore, we should naturally expect to find some clear and emphatic expression of the supposed legislative intent. On the contrary, however, we have been able to discover no indication whatever in the language, of such intent. The title of the Act is, "An Act to incorporate the Baltimore and Ohio Railroad Company." The first section names the commissioners to receive subscriptions to the capital stock and defines their duties and powers. The second section declares the capital stock shall be three millions of dollars in shares of one hundred dollars each, of which ten thousand shares shall be reserved for subscription by the State of Maryland, and five thousand for the city of Baltimore, for twelve months after the passage of the Act, and the remaining fifteen thousand shares to be open to any other subscribers. This section also declares the corporate name and confers the usual corporate powers. Sec. 3 provides a method of reduction of subscriptions in case the shares are over subscribed. Sec. 4 regulates the payment of subscriptions. Sec. 5 provides that if within twelve months after opening the subscription books, ten thousand shares

have not been subscribed, all subscriptions should be void, and the amounts paid in, less proper expenses, should be returned to the subscribers *pro rata.* Sec. 6 provides for the election of the first board of directors. Sec. 7 provides for annual elections of directors to continue the succession, and gives to the State of Maryland and the city of Baltimore, respectively one additional director for every 2500 shares of stock held by them respectively. Secs. 8, 9 and 10 deal with stockholder's meetings, statements of the company's affairs, and the oath of directors. Sec. 11 provides that if any of the stock reserved for the State or city shall not be subscribed for at the expiration of twelve months, such stock may be disposed of to any other person. Sec. 12 defines the powers and duties of the president and directors. Sec. 13 provides for an increase of capital stock, if found to be necessary. Secs. 14 and 15 provide for power to contract for construction of the railroad from the city of Baltimore to some point on the Ohio river to be determined by them, and for the exercise of the power of condemnation for that purpose, and sec. 14 also contains the power already quoted in full, to build lateral railroads. Sec. 16 relates to the crossing of roads and ways. Sec. 17 makes some further provisions as to the use and occupation of any lands or materials necessary to the construction or repair of any of said roads. Sec. 18 relates to the purchase of machines and carriages for purposes of transportation on said road, and regulates the tolls to be charged for such transportation. Sec. 19 relates to dividends; sec. 20 to penalties for injuries done to the said railroads or any of their works, machines or vehicles. Sec. 21 provides that when organized as before provided, the company shall have all the powers and privileges granted by that Act. Sec. 22 provides the Act should be null and void if the road should not be commenced within two years from the passage of the Act, and should not be finished in the State of Maryland within ten years from its commencement.

The twenty-third and last section makes the provision already noticed for connections to be made with any other railroad incorporated under the authority of this State.

It will be seen from this summary of the charter provisions that the city of Baltimore is not mentioned in the charter except where it appears in the name of the corporation in the title, and in the body of the Act; in sections two, three and eleven referring to the reservation of stock for the city of Baltimore; in section seven providing for directors on the part of the city; in section fourteen fixing the terminus *a quo* at the city of Baltimore; and in section eighteen regulating tolls to be charged on transportation "along said railway from the city of Baltimore to the Ohio river;" and nowhere in the charter is the city of Baltimore mentioned *as a port* nor is any mention made in the charter of any traffic destined for export; so that it is difficult for us to understand how from the language of the charter, there can be gathered any legislative intent "that no branch from the main line that is not a feeder of the *port of* Baltimore, is not a lateral railroad as contemplated in the charter." All great railroads penetrating the interior of the country naturally are built from or to, some seaport, with a view of sharing in the export trade, and certainly this must have been *one* of the considerations which led the Legislature to fix the city of Baltimore, the chief commercial city and the only seaport of any real importance in the State, as its eastern terminus. But this consideration falls far short of warranting the assumption that the development of the export trade of Balti more, rather than the development of all the material and commercial interests of the State and city was the *controlling* consideration in the grant of the charter, and so conclusively controlling, as to exclude from the broad and unrestricted designation of "lateral railroads," any road which was not a feeder to the city of Baltimore *in its character of a seaport*.

As was well said in the appellant's brief, "The main line was to carry traffic both east and west, but (in the view of the Court below) a lateral must furnish traffic to be carried *Eastward*, and to Baltimore or it is not a lateral. Though it pour a tide of traffic (by means of lateral roads) into Cumberland, Hagerstown or Frederick (whether from the east or the west) it would not be carrying out the purposes of its charter. The

most common purpose in building a lateral is to reach another road.    Any such road however, is capable of carrying traffic around a terminus, and therefore not a lateral." The testimony taken in this case shows that the proposed road will run through a territory without east and west railroad facilities, but that it will cross and connect with the Western Maryland, the Northern Central, and the Maryland and Pennsylvania Railroad, thereby interchanging traffic with all these roads, both giving and receiving it, and directly tending to develop the trade and transportation of the region it traverses.    Yet upon the theory adopted below these connections cannot be made under the charter.    But that this was not the policy of the State in granting this charter, appears to us to be conclusively shown by section twenty-three, which in express terms reserves "full right to the citizens of this State, or any company hereafter to be incorporated under the authority of this State, to connect with the road hereby provided for, any other railroad leading from the main route to any part or parts of this State." Surely it would be a strange legislative policy which would forbid this road to build any lateral which was not a feeder to the port of Baltimore, while permitting any other railroad thereafter to be built, to force upon it a connection designed to divert trade from any point on its line, even from its terminus at the city of Baltimore.

No Court has been more explicit than our own in laying down the rules for construction of statutes.

In *Allen* v. *Mutual Fire Ins. Co.*, 2 Md. 111, the defendants charter authorized it "to make insurance on any kind of property" and the Court was asked to restrict its meaning to real estate only.    The Court refused to do this saying that to do so "would be to violate one of the plainest, well settled rules of construction," citing 6 *Bacons Abridgment*, 380, in which it is said: "Where words in a statute are express, plain and clear the words ought to be understood according to their genuine and natural signification and import, unless by such exposition a contradiction or inconsistency would arise in the statute, by reason of some subsequent clause from whence it might be inferred that the intent of Parliament was otherwise."

In *Alexander* v. *Worthington*, 5 Md. 471, JUDGE LEGRAND said: "The language of a statute is its most natural expositor, and when the language is susceptible of a sensible interpretation it is not to be controlled by *extraneous considerations.*  *  * We are not to be at liberty to imagine an intent, and bind the letter of the Act to that intent  *  * with the view of making the letter express an intent which the statute in its native form does not evidence." And in *Smith* v. *State*, 66 Md. 217, the Court said: "Even when a Court is convinced that the Legislature really meant and intended something not expressed. by the phraseology of the Act, it will not deem itself authorized to depart from the plain meaning of language which is free from ambiguity." So in *Hawbecker* v. *Hawbecker*, 43 Md. 519, JUDGE MILLER said: "It would be dangerous or unwarrantable for a Court to grope for an intent, or to make one from their own ideas of policy or morals, and on that ground, say that a particular case is withdrawn from the operation of the plain and unambigous language of a statute." In the very recent case of *Agricultural College v. Atkinson*, 102 Md. 561, JUDGE BURKE said: "Beyond the words employed, if the meaning be plain and intelligible, neither officer, nor Court is to go in search of legislative intent; but the Legislature must be understood to intend what is plainly expressed, and nothing then remains but to give the intent effect."

We cannot therefore agree with the learned Judge below in restricting as he did the broad and unqualified language of this charter.

But we have yet to inquire what is the true meaning of the term "Lateral Railroad." In the view taken by the Circuit Court, it was not necessary for it to make this inquiry but it is necessary for us, and we are not without ample recourse to cases in other Courts of high authority. Before referring to these, it may be well to observe that there is nothing peculiar about the charter of the B. & O. R. R. Co. which would discriminate it in respect to branch roads from the charters considered in those cases. The charter of the B. & O. R. R. Co. was one of the earliest granted in this country, and is believed

to have been the model of many of the later organized roads. In most of these, the same general·power is given to construct lateral roads, and in many the language used is very nearly the same. In almost all, an important city of the State granting the charter is made one of the termini; so that the views expressed by the Courts of those States in which the meaning of this term has been considered, should be especially worthy of our consideration. In *Newall* v. *Galena & Chicago Union R. R. Co.*, 14 Ill. 273, the plaintiff sought to enjoin the defendant from constructing a lateral road from the main line towards Dixon on the ground of want of power. The language of the charter was, "and they may also construct, maintain, and use such other lateral routes as may be deemed advantageous, and expedient and necessary, under the same rights and privileges as by this Act is provided for the construction of the main route." The proposed road contemplated a connection at Dixon with the Rockford and Rock Island R. R. then in course of construction, and the Court said "The question is, is this a lateral road within the provision of the charter above quoted? We think it is. A lateral road is one proceeding from some point on the main trunk between its termini. This is a road lateral to, and proceeding from the main road. This is a simple fact. Ingenuity cannot remove or disprove it. * * We were asked in argument, if the defendants may build a road 40 miles in length, and terminating or connecting with, another road, at a distant point from the main trunk of this road, of what length, or to what point, may they not build a lateral road? We do not feel called upon to answer the question. *The Legislature has not seen fit to fix a limit*, and we do not feel called upon in this case at least, to do so. * * I fully recognize the propriety, and even necessity of applying the rule of strict construction to the powers granted in these railroad charters; but the rule can only be applied in cases of ambiguity, or where a power is claimed by inference or implication, and is not expressly given by the charter. *Where a power is expressly given, a strict construction maintains it.* There must be ambiguity to give room for construction. The Leg-

islature takes the resposibility of granting these charters, and it is for them to see that too much power is not expressly given.   *   *   The legislature has no right to give a power without restriction, relying upon the Courts to restrain its exercise within judicious limits."

In *Pa. R. R. Co.* v. *Canal Commissioners*, 21 Pa. St. 9, the effort was to extend by construction the corporate powers of the Railroad Company, and in refusing this, JUDGE BLACK, in the strong, sententious language which marked his opinions, said: "The privileges of the Pennsylvania R. R. Co. may be too rigidly restricted.   If the usefnlness of the company would be increased by extending them, let the Legislature see to it.   But let it be remembered that nothing but plain English words will do it, and when called on by counsel to enlarge corporate powers by construction, we can only repeat again and again and that our duty imperatively forbids it." To this we may properly add, that when powers have been granted in plain English words, our duty imperatively forbids us to curtail them by attempted construction.

In *B. & O. R. R.* v. *Wheeling*, 13 Grattan, 40, the same question now before us arose under the Virginia Charter of the B. & O. R. R., which was contained in the Act of March 6th, 1847.   This Act authorized the company to complete their road through the territory of the State to a depot to be established on the northern side of Wheeling creek in the city of Wheeling.   The second section provided; "That to secure to the said city of Wheeling the benefit of the western terminus, all parts of said railroad between the Monongahela river and said terminus, shall be opened simultaneously for the transportation of freight and passengers," and then made certain regulations as to tolls to be charged.   The sixth section subjected the company to the provisions of the general railroad law of 1837, by which anthority was given to any railroad subject to that law, to make lateral railroads in any direction whatever, not exceeding ten miles in length, and the Court said that provision was as much a part of the Act of March 6th, 1847, as if embodied therein *in totidem verbis.*

The Central Ohio R. R. established its terminus at Belair on the west side of the Ohio river, opposite Benwood, a few miles south of Wheeling, and the B. & O. R. R. desiring to connect directly with that road, began the construction of a branch from a point before reaching Wheeling, to Benwood, where the connection would be made by a ferry. After the passage of the Act of March 6th, 1847, in order to induce the B. & O. R. R. to accept said Act, an agreement was made between the railroad company and the city of Wheeling by which said city engaged to do certain things, and the agreement set forth: "The intention of the parties to the agreement, among other things, to secure to the city of Wheeling the practical benefits of the terminus of the B. & O. R. R. according to the provisions of said law." The city of Wheeling claimed that the construction of this branch would deprive her of the practical benefits of the terminus, and prayed an injunction to restrain its construction. Two great roads were at that time in course of construction in Ohio and approaching the Ohio river. The Central Ohio passing through the centre of the State, and the Cincinnati and Marietta passing through the southern part, and the B. & O. R. R. Co. desired to connect with both. The Court said: "In this state of things it was important that the Act should plainly express the intention of the Legislature; that nothing should be intended which was not expressed, and nothing expressed which was not intended, in order that there might be no mistake on either side. When therefore the Legislature by that Act gave to the company the branching power without any express restriction, it cannot fairly be presumed that they intended to restrict it. If they had so intended, they ought and would have said so expressly." The Court therefore held the provision applicable, and that it authorized the connection in question.

The physical situation will appear from the plat annexed hereto.

It was urged in argument that the city of Wheeling was not only entitled to the benefit of a direct and continuous railway to one of the largest and most important Atlantic cities, and all the local benefit incident to the terminus of a great railroad, but also to the benefit of connection between that and other roads, *within her limits.* But the Court answered this by saying, "She expected to obtain these by the advantages of her position, her wealth, trade, population and importance; which she hoped and expected would be sufficient to attract to her limits all connections which might otherwise have been made at some other point of the road within its limited river front of ten or twenty miles. For these expected benefits the company did not stipulate by the acceptance of the Act, except to the extent of a compliance with its terms."

In *Blanton* v. *Richmond F. & P. R. R.*, 86 Va. 618, the charter gave power to construct branch or lateral roads, and it was held that this power gave authority to construct a branch line running in the same general direction as the main line, and the fact that the new line will connect the main line with another railroad makes it none the less a branch road. The language of the charter was, "They may make or cause to be made, branches or lateral railroads, in any direction whatsoever, in connection with said railroad, not exceeding ten miles in length." Richmond was the southern terminus of the R.

F. & P. R. R., and it was proposed to build a lateral road around the city connecting with the Richmond & Petersburg R. Co., as shown in the annexed plat.

..........LATERAL
RAIL ROAD

RICHMOND

The Court said the charter placed it entirely in the power of the president and directors to say how many and in what directions branches or lateral roads should be run. "That a lateral railroad is nothing more or less than an off-shoot from the main line or stem. And this is the meaning attributed to it by the Supreme Court of Pennsylvania in *McAboy's Appeal*, 107 Pa. St. 558." It was contended in that case that the proposed road would change the terminus of R. F. & P. R. R. from Richmond where it was fixed by the charter, but the Court denied this result saying, "It simply proposes to build this branch for the purpose of carrying *through business outside of the limits of the city, leaving the passengers and* freight destined for Richmond to be delivered there. *  *  *  As it does not change the terminus, serves as a feeder to the main stem, assists the company to develop the country through which it passes, and tends to promote the public convenience both as to trade and travel, it cannot be regarded as obnoxious to any of the objections that have been raised against it."

The same views have been held and expressed in a number of other cases, among which may be cited *Pittsburg* v. *Penn-*

*sylvania,* 48 Pa. 355; *Price* v. *Pa. R. R.,* 209 Pa. St. 81; *Biles* v. *Tacoma R. R.,* 5 Wash. 514; *Howard Co.* v. *Booneville Bank,* 108 U. S. 316. We have been referred to *Akers* v. *Union N. J. R. R.,* 14 Vroom 110, as furnishing the best test of what is a lateral road, in which the Court said: "It denotes a road connected indeed with the main line, but not a mere incident of it, not constructed simply to facilitate the business of the chief railway, but designed to have a business of its own, for the transportation of persons or property to and from places not reached by the principal route." This language was used in reference to what were shown to be mere side tracks leading to freight houses on or near the line of the road. In *Grey* v. *Greenville & Hudson R. W. Co.,* 59 N. J. Eq. 385, VICE CHANCELLOR EMERY, following that case, and speaking of a road, which he said, "begins and ends on the main line, and, so far as yet appears, reaches no other points for railroad service than those on the main line as located, and distant throughout its whole length only about 225 feet from the main line," held this was not a lateral line, and granted a preliminary injunction. Subsequently an answer was filed, and the case came up on appeal in 62 N. J. Eq. 768, and the Court, while approving the opinion of the Vice Chancellor as the case was presented to him, reversed the decision, because the answer averred, and the proof showed, that the purpose of the branch was to connect with the Jersey City Belt Line, and in so deciding, used this language which is most pertinent to the case before us. "It is no objection to the legality of the proposed branch railroad that it will leave the main line on one side of the connection and return to it on the other. To compel traffic to be inconveniently carried past a natural point of departure on one side or the other and then be sent backward to the connecting point, with the alternative of laying out two branches, one from each direction, would be an unreasonable construction of the Act. The authority is to construct a branch railroad or railroads so as to effect such connection *and a connecting loop is within the authority.*" This language is directly in point in view of the connection to be made by this loop with the three railroads which it crosses.

The learned Judge below concedes in his opinion that the Court of Appeals in this State has never specifically decided what are lateral railroads under the charter of this defendant though he refers to the case of *State* v. *B. & O. R. R.*, 48 Md. 79, as throwing some light upon the subject. The distinguished counsel for the appellee, however, in their brief, and in the argument, contended that almost the identical question has already been decided in that case, and in support of their contention refer to the language of JUDGE ROBINSON on page 78 of 48 Md. The question under consideration in that portion of the opinion was whether the gross receipts of the Metropolitan Road were exempt from taxation, and it was held that they were not. In so holding, JUDGE ROBINSON said: "The original charter, it is true, authorized the appellee to build lateral roads, and this power is not limited to the construction of roads leading to lime kilns, factories and distilleries as was urged in argument by the Attorney General but authorizes the appellee to build such roads for the transportation of freight and passengers. The Metroplitan *Road was not built, however, under this provision in the original charter*, but under the Act of 1865, ch. 70, which authorized the appellee to construct a road between Knoxville and the Monocacy Junction to the boundary of the District of Cblumbia, and for the purpose, as the Act expressly declares, of providing a more direct communication from the west and northwest with the city of Washington. At this latter place it forms a junction with the Washington Branch thus making *a route* distinct from, and independent of the main line of the appellee. In no just sense can this road be considered a lateral road within the meaning of the original charter." But this language must be read in the light of, and with reference to, the particular question under consideration, as well as with reference to the Act under which the company elected to build the road. There is a clear intimation that it might have been built under the broad provision of the original charter, which the Court there says "authorized the appellee to build *such* roads for the transportation of freight and passengers;" and there is a strong pre-

sumption that the gross receipts were held taxable *because* it was not built under that provision, but under a special Act, both the title and body of which indicate that the branching power was not invoked in its construction and that the road was deliberately built as a new and independent line.

This view of the language above cited is confirmed by reference to the case of the *Mayor and City Council of Balt.* v. *B. & O. R. R. Co.*, 21 Md. 50, in which it was held that the B. & O. R. R. Co. had the right under the Act of 1836, ch. 276, to subscribe towards any lateral or connecting road not exceeding two-fifths of its estimated cost, and that the Central Ohio R. R. Co. which connects with the B. & O. R. Co. at Benwood by means of a ferry and the lateral road mentioned in the case of *Wheeling* v. *B. & O. R. R.*, 13 Grattan, *supra*, was a connecting road within the meaning of the Act of 1836, ch. 276. This conclusion could not have been reached unless our own Court of Appeals had agreed with the Virginia Court of Appeals, that the short link from the B. & O. to Benwood was a lateral road within the meaning of the Virginia Act of 1847, which we have seen was, in that respect, identical with the B. & O. Md. charter of 1826.

The conclusions we have drawn above cannot be fairly weakened by the fact that the Washington Branch and the Metropolitan Branch were built under special Acts. The Washington Branch was built under the Act of 1832, ch. 175, and the Metropolitan Branch under the Act of 1865, ch. 70. The financing of new railroad lines often compels resort to the Legislature, when there is lack of money to justify the undertaking though there may be no lack of power, and a reference to the legislation under which the Washington Branch was built shows that in that case the financial questions involved were ample reasons for proceeding under a special Act granting express power, and avoiding the question of pre-existing power, which when raised, however needlessly, must injuriously affect the credit of the securities offered the public for the prosecution of the undertaking.

The Philadelphia Branch was begun without any special

legislation therefor—in reliance upon the power in the original charter. Whether, since the building of the Washington and Metropolitan Branches, the company had grown bolder or wiser as to the extent of this power, we do not know, but the question is not what they *thought* they had, but what they *had in fact.* The appellee argues that they secured subsequently a legislative recognition of the fact that it was being built as a lateral. Ch. 223 of 1882, both in its title and in the body of the Act does recognize that fact but it also contains a number of provisions for which legislation was necessary. Corporations are not often lacking in worldly wisdom, and it is sometimes wise to "make assurance doubly sure," but it would be an unwarrantable reflection upon the legislative body to assume that this recognition was given without due consideration and advice from its judiciary committee as to its propriety. Moreover the Courts were open during the construction of this branch to any challenge of its right, and we are not advised that any such was made.

For the reasons we have given at so great length, we cannot doubt that the proposed road is a lateral road within the meaning of the charter of 1826. Notwithstanding this be so, the appellee contends that its construction is effectively forbidden by the Act of 1906, ch. 457, which declares it to be unlawful for any person or corporation to lay any track for a steam railway within certain described portions of Howard County and of Baltimore County, the property of the appellee proposed to be taken under these condemnation proceedings, being within the described area of Baltimore County.

The plaintiff's bill avers that the defendant proposes to lay four parallel tracks along said line which, when laid may be used for freight and passenger traffic not only by the B. & O. R. R. but also under trackage agreements by any other company.

It avers that "the section of country through which said tracks are to be laid is a highly developed part of the suburbs of Baltimore City, in which are many beautiful and costly homes, the value of most of which would be largely dimin-

ished, if not destroyed, by the building of said railroad with-
out any possibility of recovering any damages in any condem-
nation proceeding." It further alleges that the Pa. R. R. Co.
had intended building a somewhat similar line near the line of
the now proposed road, and that upon the representation of
many citizens of Baltimore City and County that it would be
destructive of the suburban development of Baltimore and its
vicinity and that the railroad could just as well accomplish its
purpose by building a line further away from the city, the
Legislature passed the Act above mentioned, and that said
Act was passed in the *bona fide* exercise of the police power
with which it is constitutionally clothed.

The defendant in its answer alleges that it located and
adopted the line mentioned before the passage of the Act
mentioned ; that its estimated cost of construction will be ap-
proximately $9,000,000 ; that the reasons for its construction
are the necessity of relieving the obstruction of the tunnels in
Baltimore City of the volume of through freights, now pass-
ing through them, and the need of lower and more uniform
grades than those now used in approaching and leaving the
city, as set forth in the first part of this opinion ; and the need
of connection with the Maryland & Pa. R. R. Co. which can be
effected by the new line, but which does not exist and cannot
be secured under the present arrangement. It further alleges
that the section traversed by the proposed line is, except at
Pikesville, a rural district of farms and woodland sparsely
settled, and in no sense a highly developed part of the suburbs
of Baltimore City, but is distinctly separated from the city and
its suburbs by large tracts of land, of low price, used for
farming and sold by the acre and that said road is, at its
nearest point, three miles from the legal limits of the city and
more than five miles from the built up part of the city.

It denies that said Act was passed in the exercise of the
police power, or that it bears any real relation to the preserva-
tion of the public health, safety, morals or welfare of the
people, and that its only purpose is to relieve the property of
a few large land owners from liability to be taken for public

use, though such use is necessary to enable property owners, on both sides of the favored few to enjoy railroad facilities, and that it will operate, if allowed to stand, as a grant of special and unusual privileges to a few individuals at the expense of the rest of the public.

It denies that it is practicable to build anywhere outside of the prescribed area, except at a cost nearly if not quite double the cost of the proposed line, which would be absolutely prohibitive.

It alleges that by virtue of the location and adoption of the line laid down, it has acquired under its charter vested rights of which it cannot be deprived by the subsequent Act of the Legislature, the effect of which would be to impair the obligations of a charter contract; and further that said Act is invalid because it violates sec. 29 of Art. 3 of the Constitution of Maryland; 1st, because the Act embraces more than one subject; 2nd, because the criminal provisions of the Act are not described in its title; 3rd, because it is not enacted in articles and sections to conform to the Code.

The testimony taken has been carefully examined, and shows quite clearly that except in the immediate vicinity of the villages of Pikesville and Sherwood, the territory traversed is almost wholly in the language of the answer, "a rural district of farms and tracts of woodland sparsely settled, and in no sense a highly developed part of the suburbs of Baltimore City." This appears not only from the testimony of the defendant's engineers who surveyed and located the line, but from the testimony of the real estate brokers produced by the defendant, whose evidence was not attempted to be rebutted except by Mr. Preston, Inspector of Buildings of Baltimore City, whose testimony was confined to the sale in October, 1906, of a single piece of property of six and three quarter acres on Park Heights avenue (which is crossed at right angles by the proposed line), about half a mile from the plaintiff's property, and which sold for $2,000 per acre. Upon cross-examination it appeared that the property on Park Heights avenue below Mr. Preston's property in the direction of the city is not laid off for building purposes.

The only witnesses for the plaintiff were the plaintiff himself, and Mr. Samuel M. Shoemaker, who resides in Green Spring Valley near the Reistertown turnpike.   The plaintiff owns a tract of 540 acres.   From this tract he sold 20 acres six years ago to the suburban club, which is now occupied by it, and he has platted for sale in lots, two parcels one of 14 acres and another of 18 acres, for the latter of which he has had an offer of $1,500. an acre.   Mr. Shoemaker's property is used for farming and dairy purposes, and is occupied as his own residence, but is not stated to be platted or designed for sale for suburban homes.   The testimony of these gentlemen makes it abundantly appear that the property of the plaintiff will be damaged by the construction of the proposed road and it appears from all the testimony on both sides that there are some others, comparatively few in number, and almost exclusively in the vicinity of Pikesville, Sherwood and perhaps Ruxton, whose property will also be damaged thereby. Wherever any property is actually taken for such purposes, compensatory damages are allowed and it is common experience that juries rarely fail to exercise a wise and just liberality in awarding these damages not only upon the basis of value of the land actually condemned, but with a view to the injurious effect upon that which is not actually taken.   The repugnance of those who own and occupy attractive homes to have them actually invaded, or their comfort and attractiveness diminished by railroad construction, is so natural and rational as to compel the sympathy of Courts and juries, but it is just because this natural feeling, which extends to all classes of property holders, cannot be permitted to stand in the way of public improvements, and especially in the path of facilities for transportation, that the doctrine of eminent domain has been able to maintain its place in the law.

The evidence is conclusive and indeed undisputed, that the cost of constructing a line outside of the prescribed area would be double that of the proposed line, or about $18,000,-000, and that this cost would be prohibitive.

All crossings of public or private roads will be overhead or

underneath as testified to by Mr. Jenkins the locating engineer of the line. The evidence is clear that the territory traversed by this line is without any railroad facilities east or west; that it will develop and build up all this territory and will afford the only practicable connection of the B. & O. R. R. Co. with the Md. & Penna. Railroad Co. with which there is now no connection, and that it will relieve the congestion of the tunnels in the city which are now taxed beyond their capacity. The anticipated diversion of commerce from the city of Baltimore does not appear to rest upon any substantial foundation. If there were such the Chamber of Commerce of that city should be prompt to discover and proclaim it, but in the last annual report of the president and directors of that body made in January 1907, it is declared that "the movement of merchandise in which there could be no local interest has been the cause of serious loss and detriment to local merchants," and that the business of the city "has been greatly hampered by local tracks and facilities being used to handle freight traffic from points beyond; therefore the wisdom of the speedy arrangement by which all foreign traffic can be diverted, and our insufficient facilities relieved, is so apparent that there should be but one opinion upon the subject."

A careful consideration of all the testimony has convinced us that there is no such suburban development along the line of the proposed road as is claimed in the plaintiff's bill, and in the argument of his counsel, and which is made the legal basis of the legislation upon which the plaintiff relies to defeat the construction of the road.

The defendant contends that the Act of 1906 is invalid because it impairs the obligation of the contract embodied in the charter of the B. & O. R. R. Co. This argument is based upon the fact, admitted by the plaintiff, that the charter of the B. & O. R. R. Co. is irrepealable. It is also based upon the assumption (which we have herein decided to be correct) that the railroad, under its charter, by a proper construction thereof, has the right to build this cut-off as a lateral road.

Quoting now from the brief of the appellee: "Assuming

these two things, the argument of the Railroad Co. is that it can build this lateral road wherever it pleases, and any interference with the building of it, wherever it may please so to place it is an impairment of the obligation of the contract contained in its charter. The appellee, on the contrary, maintains, also upon the assumptions already made, that this is not any interference with the essential right of the Railroad Co. to build a lateral road, if they have any such right under their charter, but is simply a regulation of that right, which it is entirely competent to make under its powers." The question therefore which we have to decide is whether the Act of 1906 is such a regulation of the defendant's charter right as, under all the circumstances of this case, brings it within the police power of the State.

JUDGE COOLEY in his work on *Constitutional Limitations*, 6th ed. p. 710, says: "The limit to the exercise of the police power in these cases (the impairment of the obligation of contracts) must be this; the regulations must have reference to the comfort, safety or welfare of society; they must not be in conflict with any of the provisions of the charter; and they must not, under *pretense of regulation* take from the corporation any of the *essential rights and privileges* which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise."

In *Thorpe* v. *Rutland & Burlington R. R. Co.*, 27 Vt. 151, a leading and much quoted case, JUDGE REDFIELD said: "All the cases agree that the indispensable franchises of a corporation cannot be destroyed or essentially modified. But when it is attempted upon this basis to deny the power of regulating the *internal police* of the railroads and their mode of *transacting their general business*, so far as it intends unreasonably to infringe the rights or interest of others, it is putting the whole subject of railway control quite above the legislation of the country." With this careful and well considered language, both as to the main proposition and the qualification, we fully agree.

The general proposition is also well understood that "the constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts.' *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 672. But this general proposition is not universal in its application, and has its own well recognized exceptions.

The first and a fundamental exception, in cases involving corporate rights conferred by a charter, is that stated by JUDGE COOLEY, *supra*, that a police regulation "must not be an amendment of the charter in curtailment of the corporate franchise."

In the case before us, the original charter gave the defendant two distinct corporate franchises of equal dignity and rank, both conferred in the same section and in substantially the same language; the first being the right to construct and maintain a railroad from the city of Baltimore to some suitable point on the Ohio river, and the second, to make or cause to be made, lateral railroads *in any direction whatsoever*, in connection with said railroad from the city of Baltimore to the Ohio river. The only restriction upon the route of the main road was that the eastern terminus should be at the city of Baltimore, and the western terminus at some point on the Ohio river. As to the lateral roads there was absolutely no restriction whatever. As to both these essential rights and privileges the faith of the State is pledged by the Act of 1826, and as JUDGE REDFIELD has said in *Thorpe* v. *Rutland and Burlington R. R. Co.*, *supra*, "all the cases agree that they cannot be destroyed or essentially modified." The Legislature *could* have said in the charter of 1826, "Provided that no such lateral road shall be built" within the limits of the territory defined in the Act of 1906, or any other territory from which it might have been thought proper to exclude the defendant. But it made no such exclusion and reserved no future right to make such. The Act of 1906, in so far as it is sought to be applied to the B. & O. R. R. is as substantially an amendment of the charter in curtail-

ment of its corporate franchise, as if its title were "An Act to repeal sec. 14 of ch. 123 of the Acts of 1826, and to re-enact the same with amendments," and as if the body of such Act had re-pealed and re-enacted sec. 14 with a proviso excluding the de-fendant from the territory described in the Act. Such legisla-tion, cast in the form of an amendment, would be void, and is none the less void, because denominated a police regulation. The third section of that Act repeals all laws and parts of laws inconsistent with the provisions of that Act, thus indicat-ing its purpose to amend the charter of 1826 in so far as it may be in conflict with that Act.

But apart from that consideration we are of opinion that this Act cannot be availed of to defeat the proposed road.

In *Dobbins* v. *Los Angeles*, 195 U. S. 223, it was contended upon the supposed authority of *Munn* v. *Illinois*, 94 U. S. 113, that the Legislature is the exclusive judge of the propriety of police regulation when the matter is within the scope of its power, but the Court then said, "The observations of Mr. CHIEF JUSTICE WAITE in that connection had reference to the facts of the particular case and were certainly not intended to declare the right of either the Legislature or a city council to arbitrarily deprive the citizen of rights protected by the Con-stitution under the guise of exercising the police powers re-served to the State. It may be admitted that every intend-ment is to be made in favor of the lawfulness of regulations to promote the public health and safety, and that it is not the province of the Courts except in clear cases to interfere with the exercise of the power for the protection of local rights and welfare of the people in the community. But notwithstand-ing this general rule of the law, it is now thoroughly well-settled by decisions of this Court that municipal by-laws and ordinances, and even legislative enactments, undertaking to regulate useful business enterprises, are subject to investiga-tion in the Courts with a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether under the guise of enforcing police regulations there has been an unwarranted and arbitrary interference with the

constitutional right to carry on a lawful business, to make contracts, or to use and enjoy property."

So in *Lawton* v. *Steele*, 152 U. S. 133, the Supreme Court said: "To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that *the interests of the public generally, as distinguished from those of a particular class*, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purposes and not unduly oppressive upon individuals. The Legislature may not under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the Courts."

Once more, in *Lochner* v. *New York*, 198 U. S. 45, the Court said: "It is impossible for us to shut our eyes to the fact that many of the laws of this character while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are in reality, passed from other motives. *We are justified in saying so when from the character of the law, and the subject upon which it legislates*, it is apparent that the public health or welfare bears but the most remote relation to the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is, or is not repugnant to the Constitution of the U. S. must be determined from the natural effect of such statutes, and not from their proclaimed purpose."

The evidence in this case not only wholly fails to show that the interests of the public generally require the enactment of this law, but it satisfies us that it has been enacted in the interest of a particular class, viz., the property owners nearest the line of the road, whose property will undoubtedly be rendered less desirable by the construction and operation of the road. If the public welfare, and the general advancement and prosperity of the territory described in the Act were

really at stake it would have been an easy matter to bring a cloud of witnesses in proof of this fact, in addition to the plaintiff himself and the two gentlemen whom he produced·

It is not denied that there is a limit to the valid exercise of the police power by the State.   If there were not such a limit, the claim of the power "would become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint," and we are forced to the conclusion that "the limit has been reached and passed in this case."

The counsel for the appellee lay much stress upon the case of *C. B. & Q. R. W.* v. *Drainage Commissioners*, 200 U. S. 592, in which the Court said that the police power embraced regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety.

In that case a public corporation, charged by law with the duty of causing a large body of swamp lands to be drained and made capable of cultivation, adopted a plan which required the enlarging and deepening of the channel of a natural water course running through the district, the best and only practicable mode of effecting the drainage.   This plan also required the removal of the foundations of a bridge erected by the defendant railway over this water course, which the railway company refused to do, or permit to be done until it was paid such a sum as would compensate it for the cost of removal and of constructing a new bridge over the widened and deepened stream.   It was held by the Court that the drainage of so large a body of lands *"so as to make them fit for human habitation,* is a public purpose, to accomplish which the State may, by appropriate agencies exert the general powers it possesses for the common good."   The character of that law being as it was a general law operating upon all swamp lands throughout the State, and the subject upon which it operated not, as here, the exclusion of transportation facilities from a large region, but merely the question of who should bear the cost of removing and restoring the bridge are so

widely different from the one before us, as to deprive that case of any real application to the present.

The great and unusual privilege enjoyed by the B. & O. R. R. Co. in the exemptions from taxation secured by its charter under our decisions may have been unwisely granted and certainly should not be extended by construction, but the fact that they have been unwisely granted cannot justify Courts of justice in denying the exercise of a right clearly conferred and beyond the power of withdrawal by repeal.

For the reasons stated the decree appealed from must be reversed.

> *Decree reversed, injunction dissolved and bill dismissed with costs to the appellant above and below.*