# THE JONES HOLLOW WARE CO.

## *vs.*

## CHARLES T. CRANE ET AL., CONSTITUTING THE STATE BOARD OF PRISON CONTROL, AND THE STATE ROADS COMMISSION.

*Prison labor on public roads: constitutional; police power; and obligation of contracts.*

Chapter 308 of the Acts of 1918, providing for the State Board of Prison Control to employ the prisoners in the Maryland Penitentiary for work on roads and in stone quarries, operated by the State Roads Commission, is not unconstitutional and void as impairing the obligation of the contract of the Directors of the Maryland Penitentiary for the employment of prisoners therein by contractors, and the appellants (the contractors) are not entitled to a decree for specific performance for that contract to the extent of depriving the State Board of Prison Control of the power and authority vested in said Board by said Act, or to an injunction restraining said Board from further exercise of power and authority under it.                                 pp. 121-124

If an Act has a real and substantial relation to the police power, no inquiry as to its unreasonableness can arise, because it is a judgment of the lawmakers and not of the courts which must control.                                 p. 120

It is the duty of the State, in the exercise of its police power, to provide for the custody and maintenance of convicts as an essential part of the administration of criminal laws enacted for the protection of the public.                     pp. 122-123

It is the duty of the State to make all reasonable regulations for the preservation of their health, moral and physical well-being.                                 p. 116

The State can not, by contract or otherwise, barter away its duty and right to adopt such measures as it may from time to time deem advisable for the promotion of those ends.

pp. 116-118

The interdiction in the United States Constitution against the impairment of the obligation of contracts does not prevent a State from exercising the police power to protect the lives, health, morals, comfort and general welfare of the people; such power is paramount to any right under contracts between individuals.                                    pp. 118-119

The power that the State may exercise in this regard is the overruling law of necessity, and is founded upon the maxim, *salus populi est suprema lex.*                          pp. 116-1121

*Decided March 5th, 1919.*

Appeal from Circuit Court No. 2 of Baltimore City. (AMBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Shirley Carter* (with whom were *Bernard Carter & Sons* on the brief), for the appellant.

*Ogle Marbury, Acting Attorney General,* and *Philip B. Perlman, Assistant Attorney General,* (with whom was *Albert C. Ritchie, Attorney General,* on the brief), for the appellees.

*Osborne I. Yellott,* by leave of Court, appeared as *amicus curiae* for the National Committee on Prison Labor.

THOMAS, J., delivered the opinion of the Court.

Sections 623 to 651 of Article 27 of Volume 3 of the Code of Public General Laws, under the sub-title "State

Penitentiary," provided for the appointment of six directors to manage the affairs of the penitentiary, and declared that the name and style of that institution should be "The Directors of the Maryland Penitentiary," and that by that name the directors should have power to institute any suit or suits for any sums of money due the institution, for injury to its property, for breach of any contract made with them in their official capacity, or on official bonds of any officer, etc. By section 639 the directors were given the control and management of the financial affairs of the institution. Section 641 authorized the directors to "enter into such contracts for the employment of the convicts in the penitentiary and for the sale of the manufactures in the institution as they" deemed proper, etc., and section 642 provided that the expenses of the penitentiary should be defrayed out of the funds thereof, and that no demand should be made upon the State for that purpose "except for such sums as may be payable by law."

For some years prior to 1914 there existed a public sentiment in favor of prison reform and the abolishment of contracts for prison labor, and in that year a bill was introduced in the Legislature to repeal the sections of the Code referred to, to abolish the board of directors of the Maryland Penitentiary and the board of managers of the Maryland House of Correction, and to create a board under the name of "The State Board of Prison Control," with full power and authority to manage and control said institutions. That bill was passed by both Houses of the General Assembly, but, because of certain features not affecting its general purpose, failed to receive the approval of the Governor. Acts of 1914, Chap. 466. It is a matter of common knowledge that prior to the election of a new Governor and a new Legislature in the fall of 1915 the sentiment in favor of the reforms mentioned had become so pronounced that both of the leading parties in the State declared in favor of abolishing contract labor in penal institutions.

In November, 1915, the directors of the penitentiary, acting under the authority contained in section 641 of Article

27 of the Code, entered into a contract with the Jones Hollow Ware Company of Baltimore City, a body corporate, the appellant in this case, by which the directors agreed, for the period of five years, commencing on the first of December, 1915, "to hire to" that company "two hundred and forty (240) male convicts at seventy-five cents per day for each male convict up to the number of one hundred and twenty (120) and seventy cents (70c) per day for each male convict in excess of the first one hundred and twenty (120)." The contract provided:

> "In the event of the party of the first part (the directors of the penitentiary) becoming short of convicts, however, and thereby being unable to furnish the complement of convicts under this contract and under other contracts for the hiring of convicts, then it is understood that it is to furnish to the said party of the second part only its pro-rata of convicts, the number to be furnished them and other contracts to be ratably reduced. It is also understood and agreed that during the continuation of this contract, that, when any new convicts received and confined in the Maryland Penitentiary, after the first day of December, nineteen hundred and fifteen, are employed under this contract, no compensation is to be paid to the party of the first part by the party of the second part for the labor of said new convicts for the space of thirty (30) days from the date of their first employment, unless previous service or employment of this kind of work has rendered said new convicts familiar with the same."

The fourth paragraph of the contract is as follows:

> "The party of the first part also agrees to rent to the party of the second part the ground floor of the building north of the warden's office, the entire two-story and basement building west of the warden's office, with the one-story building immediately north of the last described building (but not to include any part of the building east of the warden's office), to-

gether with the use of the engine and boiler located in the west wing, and also the new plain one-story brick building heretofore erected by them, for the sum of fourteen hundred and eighty dollars ($1,480.00) per annum, payable monthly in cash; and the parties of the second part further agree to furnish stoves and fuel for heating and to keep the glass in the workshop in good order, and to keep and leave said buildings, engine and boilers in good order, damage by fire and usual wear and tear excepted. It is further agreed that the parties of the second part shall pay the sum of one hundred and fifty dollars ($150.00) annually for water used by them, said sum to be paid on the first day of March of each year."

By the sixth paragraph of the contract it was agreed that the appellant should have the exclusive right to carry on the business of an iron foundry in the penitentiary during the term of the contract. The twelfth paragraph required the appellant to give a bond in the penalty of $20,000.00 for the faithful performance of the contract, and by the thirteenth paragraph it was agreed:

"If national legislation adversely affects the employment of contract convict labor in the penitentiary, or interfere with the disposal of the product of such labor, either party shall have the right to terminate this contract by giving one year's notice in writing to the other."

Shortly after the execution of the contract with the appellant, the Legislature passed the Act of 1916, Ch. 556, providing for the appointment of "The State Board of Prison Control," and declaring that

"From and after the appointment and qualification of the said State Board of Prison Control, the said directors of the Maryland Penitentiary and the board of managers of the Maryland House of Correction shall be and the same are hereby dissolved and abolished."

Section 626 of the Act provides:

> "From and after the appointment and qualification
> of said Board of Prison Control, all rights, powers,
> duties, functions, liabilities, obligations, franchises,
> privileges, and property, real and personal, in any
> wise had, enjoyed or held by or vested in the Directors
> of the Maryland Penitentiary, or the Board of Man-
> agers of the Maryland House of Correction, shall be
> had, enjoyed and held by and vested in the said State
> Board of Prison Control; and, from and after their
> appointment and qualification, the said State Board of
> Prison Control shall be in all respects successors in
> right, title, interest and liability, to the Directors of
> the Maryland Penitentiary, and the Board of Man-
> agers of the Maryland House of Correction; but noth-
> ing in this Act shall be construed to impair or abro-
> gate any existing contract."

Section 628 gives the Board of Prison Control full power
and control over the Maryland Penitentiary and the Mary-
land House of Correction, and declares, that the Board
"shall have any and all incidental powers and authority appro-
priate and convenient to enable the said Board to fully dis-
charge the powers of management, control, supervision, visi-
tation and inquisition conferred upon them" by the Act.
Section 629 provides that the title to and possession of all the
property "appertaining to" the Maryland Penitentiary and
Maryland House of Correction shall vest in and be held by
the State Board of Prison Control, as trustees for the State,
and authorizes the Board, with the consent of the Board of
Public Works, to purchase or otherwise acquire on behalf of
the State any real property appropriate to the needs of said
institutions.  Section 630 of the Act was as follows:

> "The said Board shall establish and maintain a sys-
> tem of labor for prisoners to supersede the present
> system of contract labor in the Maryland Peniten-
> tiary and the Maryland House of Correction, as soon
> as it shall deem the same expedient and proper, and

in case said Board does not establish such a system of labor before the convening of the General Assembly of 1918, then the Board shall report to such General Assembly the result of the investigation of the subject, and any recommendations which it may deem desirable to make thereon. The said Board shall have power and authority to place prisoners at labor upon State works whenever in the judgment of said Board the same shall be expedient and proper, upon such terms as to it shall seem wise. The said Board is hereby directed to provide, whenever in its judgment the same may be expedient, such form of labor as will offer an opportunity to prisoners to earn a surplus over the cost of their maintenance to the State, and said Board shall further provide in its discretion for the payment of any surplus so earned, to the prisoner earning the same, or to such person or persons as he may direct."

In accordance with section 630 of the Act of 1916, Ch. 556, and an order passed by the Senate of Maryland, the State Board of Prison Control reported to the General Assembly of 1918 that there were eight hundred and fifty-three prisoners in the Maryland Penitentiary on February 28th, 1918, and that of that number seven hundred and thirty-one were employed by contractors. Senate Journal, 1918, 531. Thereafter the Legislature passed the Act of 1918, Ch. 354, entitled:

"An Act to repeal and re-enact with amendments Sections 626 and 630 of Article 27 of the Annotated Code of Maryland, title 'Crimes and Punishments,' sub-title 'III. Places of Reformation and Punishments,' sub-head 'The State Board of Prison Control,' as the same were enacted by Chapter 556 of the Acts of the General Assembly of Maryland of 1916, the said sections as thus amended relating to the establishment of a system of labor for prisoners to supersede the present system of contract labor in the Maryland Penitentiary and the Maryland House of Correction."

The only amendment made by the Act of 1918 of section 626 as enacted by the Act of 1916 is the omission from that section of the provision "but nothing in this Act shall be construed to impair or abrogate any existing contract," and the amendment of section 630 consists in the omission of the words "and in case such Board does not establish such a system of labor before the convening of the General Assembly of 1918, then the Board shall report to such General Assembly the result of the investigation of the subject, and any recommendations which it may deem desirable to make thereon," and the insertion, in their place, of the following provision:

> "and the Board is hereby vested with all power and authority necessary to that end and to put such system of prison labor when established into operation and effect."

The Legislature also passed Chapter 306 of the Acts of 1918, repealing and re-enacting with amendments section 61 of Art. 91 of the Code so as to read as follows:

> "61.   For the purpose of building and constructing or maintaining any roads, bridges and highways under the provisions of this Act, or for the purpose of working in any stone quarry operated by said Commission (State Roads Commission), the said Commission is hereby authorized to make requisition on the State Board of Prison Control for as many inmates of the Maryland Penitentiary and the Maryland House of Correction as may be necessary for said purpose; and the said State Board of Prison Control is hereby directed to furnish the same with such guards or keepers as can be spared from their duties at said institutions; and any additional guards or keepers necessary for the safekeeping of said inmates shall be furnished and appointed by said Commission.   The said Commission shall in conjunction with the aforesaid State Board of Prison Control provide for the maintenance and safekeeping of said

inmates of the House of Correction and the Mary-
land Penitentiary while so employed."

On the 2nd of October, 1918, the Jones Hollow Ware
Company filed in Circuit Court No. 2 of Baltimore City its
bill of complaint against Charles T. Crane and others, con-
stituting the State Board of Prison Control, and the State
Roads Commission in which, after alleging that it was a
corporation duly incorporated under the general incorpora-
tion laws of the State for the purpose of manufacturing and
selling hollow ware and other iron goods, and after setting
out the execution and provisions of the contract with the
directors of the Maryland Penitentiary referred to, it alleges
that in order to enable it to perform said contract the plain-
tiff had installed and maintained in the buildings of the
penitentiary machinery, trucks and other foundry equipment
and fixtures, and had constructed and maintained permanent
buildings upon the penitentiary premises to the value of
$100,000.00, and that relying upon the faithful performance
of the contract by the directors of the penitentiary and the
State Board of Prison Control, it had obligated and bound
itself by contracts for fuel and materials sufficient to enable
it to perform its said contract and certain contracts by which
it had bound itself for the manufacture and delivery of cook-
ing and food preserving utensils, sanitary plumbing fixtures
and special castings to the amount of $157,000.00. The sixth
paragraph of the bill alleges that notwithstanding the contract
of the plaintiff with the directors of the penitentiary had
been entered into by said directors and continued by the State
Board of Prison Control "for commercial uses, reasons and
purposes, to secure the moneys and revenue issuing and result-
ing therefrom; and notwithstanding the fact that prior, up
to and since, July 5, 1918, there had been a sufficient num-
ber of convicts committed to and confined in the Maryland
Penitentiary, and under the control and direction of the State
Board of Prison Control," * * * "to enable them to furnish

the plaintiff at least two hundred and sixteen (216) male convicts daily," under the terms and provisions of the contract, nevertheless the State Board of Prison Control, in willful disregard of its obligations, against the protest of the plaintiff, and to the plaintiff's irreparable loss and injury, "and for commercial and business purposes only, and for the revenue to be derived therefrom, have arbitrarily,—assuming the right so to do under the provisions of Chapter 354 of the Acts of the General Assembly of Maryland, of the year 1918, and under the provisions of Chapter 306 of the Acts of the General Assembly of Maryland, of the year 1918, at the instance of the State Roads Commission of Maryland, * * * not only refused to furnish the plaintiff with the number of convicts to which it is entitled in accordance with the terms" of the contract, "but have also, purely for the commercial and business purposes aforesaid, and the revenue to be derived therefrom, since July 5, 1918, from time to time, taken out of the plaintiff's foundry, in the penitentiary sixty-six (66) or more convicts, thus reducing the number of convicts in the plaintiff's foundry from the number of two hundred and twenty-one on July 5, 1918, to one hundred and fifty-five or less on September 30, 1918, on which last mentioned day twenty-one convicts were taken from the plaintiff's foundry and hired out to work for contractors for railroad companies, and put to work for contractors and others on State Roads, * * * the larger number of said convicts so taken from the plaintiff's foundry being long-term convicts, who, under the long and careful tutorlage and instruction and teaching of the plaintiff, had become expert and skilled moulders and iron foundry men, whose places it is now impossible for the plaintiff to fill from the men left it up to this time, and whose loss to the plaintiff is irreparable; and whose continued absence will render it impossible for the plaintiff to fulfill its contracts and meet its obligations." This paragraph further alleges that the plaintiff is credibly informed by the officers and agents of the State Board of Prison

Control in the penitentiary, that said Board, at the instance
of the State Roads Commission "and otherwise," will further
reduce and curtail the number of convicts in the plaintiff's
foundry in the penitentiary by removing them therefrom,
and, "purely for commercial and business purposes and the
increased revenue to be derived therefrom, intend to hire
them out and put them to work for contractors and others
outside of the penitentiary."

The seventh paragraph alleges that if the State Board of
Prison Control, "at the instance of the State Roads Com-
mission, or otherwise, * * * are permitted to disregard" said
contract, * * * and are allowed to put to work outside of the
penitentiary "any more of the convicts now in the plaintiff's
foundry in the penitentiary, and are not required to return to
the plaintiff's foundry the long-term men heretofore hired out
and put to work outside of the penitentiary, and the twenty-
one men convicts taken from the plaintiff's foundry on Sep-
tember 30th, 1918, the obligation of the plaintiff's contract
with the State Board of Prison Control will not only be
impaired in contravention of plaintiff's rights secured to it
by section 10 of Article 1 of the Constitution of the United
States, prohibiting any State to pass any law impairing the
obligation of contracts," but in addition thereto the plaintiff
would thereby suffer irreparable damage for which no ade-
quate redress could be obtained at law, "for the reason that
the convict labor contracted to be supplied by the defendants
to the plaintiff in its foundry in the penitentiary is indis-
pensable to the business of the plaintiff, and the plaintiff
could not otherwise obtain labor for its foundry in the peni-
tentiary, nor has it a foundry, nor could it now obtain one,
outside of the penitentiary, or labor to work therein even
if it had a foundry outside of the penitentiary, and fulfill
its contracts and obligations."

The prayers of the bill are (1) that the contract may be
specifically enforced so that the State Board of Prison Con-
trol "may be required to furnish the plaintiff in its foundry

in the penitentiary the number of convicts under their control to which it may be entitled under and by the terms" of the contract, "including the return to the plaintiff's foundry in the penitentiary the long-term convicts recently removed therefrom."

(2) That the State Board of Prison Control and its officers, etc., may be enjoined "from removing any more convicts now or hereafter confined or committed to the penitentiary, which are now assigned to work in plaintiff's foundry in the penitentiary, or who may hereafter be so assigned, for the purpose of hiring them out or putting them to work to or for contractors or other persons outside of the penitentiary," and that the State Roads Commission, its officers, etc., may be enjoined "from making requisition upon, or otherwise securing, from the State Board of Prison Control, convicts now confined in, or who may hereafter be confined in or committed to, the Maryland Penitentiary, so far as the same would reduce the number of convicts in plaintiff's foundry."

(3) That Chapters 306 and 354 of the Acts of 1918 may be declared unconstitutional and void, so far as they may be construed "as authorizing and empowering the State Board of Prison Control to remove convicts confined in and committed to the Maryland Penitentiary from the plaintiff's foundry therein, and not to comply in all respects with" said contract, "as being laws impairing the obligation of said contract in contravention of section 10 of Article 1 of the Constitution of the United States."

The defendants demurred to the bill on the ground that it does not state such a case as entitled the plaintiff to any relief against the defendants, and is bad in substance, and this appeal is from the decree of the Court below sustaining the demurrer and dismissing the bill.

The power and authority of the directors of the penitentiary, under the provisions of the Code then in force, to make the contract sought to be enforced in this case, is not questioned. Nor can it be doubted that the provision of the Con-

stitution of the United States here invoked refers to contracts between individuals and a state as well as contracts between individuals. 8 *Cyc.* 930; *Wolff* v. *New Orleans,* 103 U. S. 358. It must also be conceded that the things complained of in the bill of complaint were done by the State Board of Prison Control in pursuance of the power and authority supposed to be vested in the Board by Chapters 306 and 354 of the Acts of 1918. The important question, therefore, to be determined in this case is whether the contract between the appellant and the directors of the penitentiary is one within the scope and purpose of the constitutional restriction relied on by the appellant.

It is said in 21 R. C. L. 1168: "The erection and operation of prisons and jails * * * is a purely governmental function, being an indispensable part of the administration of the criminal law. They are a part of the police system for the preservation of order and the security of society, and are established by the State in the exercise of its sovereign powers, in performance of its duty to provide for the custody, employment and maintenance of convicts. They are a public necessity." Again it is said that statutes authorizing the hiring out of convicts are constitutional, and that among the reasons given for upholding the right of the State to so provide is "that the substitution of hard labor outside of the walls of the prison when the convicts condition is normal, where he has fresh air, pure water and wholesome food, which are superior advantages over close confinement, is a humane and ameliorating policy in reference to the convict himself, as well as a more profitable use of his labor for the state." 21 R. C. L. 1186-1187.

In *Dartmouth College* v. *Woodward* (4 Wheaton, 518), MR. CHIEF JUSTICE MARSHALL said: "That the framers of the constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us, is not to be so construed, may be admitted." In the case of *Beer Co.* v. *Massachusetts,* 97 U. S. 25, it is said: "All rights

are held subject to the police power of the State. * * * Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals.   The Legislature cannot, by any contract, divest itself of the power to provide for these objects. . They belong emphatically to that class of objects which demand the application of the maxim, *salus populi suprema lex;* and they are to be attained and provided for by such appropriate means as the legislative discretion may devise.   That discretion can no more be bargained away than the power itself."   The principle was applied in *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659, where it was claimed that an ordinance passed in pursuance of an authority to define and abate nuisances impaired the obligation of the contract contained in the charter of the Fertilizing Company. In the case of *Stone* v. *Mississippi,* 101 U. S. 814, where the Legislature of Mississippi in 1867, in consideration of the payment of certain sums, granted a charter to a lottery company for twenty-five years, and where the provisions of a constitution adopted by that State in 1868 declared that no lottery should thereafter be drawn, the Supreme Court said: "If the Legislature that granted this charter had the power to bind the people of the State and all succeeding legislatures to allow the corporation to continue its corporate business during the whole term of its authorized existence, there is no doubt about the sufficiency of the language employed to effect that object. * * * Whether the alleged contract exists, therefore, or not, depends on the authority of the Legislature to bind the State and the people of the State in that way.   All agree that the Legislature can not bargain away the police power of a State.   'Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State; but

no Legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police.' *Metropolitan Board of Excise* v. *Barrie,* 34 N. Y. 657; *Boyd* v. *Alabama,* 94 U. S. 645. * * * The question is therefore directly presented, whether, in view of these facts, the Legislature of a State can, by the charter of a lottery company, defeat the will of the people, authoritatively expressed, in relation to the further continuance of such business in their midst. We think it cannot. No Legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them. For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself. * * * the power of governing is a trust committed by the people to the government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority, while in power; but they can not give away nor sell the discretion of those that are to come after them, in respect to matters the government of which, from the very nature of things, must 'vary with varying circumstances.' " In the case of *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746, the Court had to pass upon the validity of an ordinance, passed in pursuance of authority conferred by the Constitution adopted by the State of Louisiana in 1879, which in effect repealed an exclusive privilege granted to the appellee by the Legislature of 1869 for stock-landing and slaughter houses at New Orleans for twenty-five years. The Court held that the

Constitution of 1879 and the ordinance were not void as impairing the obligations of the contract, and said: "While we are not prepared to say that the Legislature can make valid contracts on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so embraced, it cannot, by any contract, limit the exercise of those powers to the prejudice of the general welfare. These are the *public health* and *public morals*. The preservation of these is so necessary to the best interests of social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime." In the case of *Barbier* v. *Connolly,* 113 U. S. 27, referring to the limitations contained in the Federal Constitution, the Court said they were not "designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people." In the case of *New Orleans Gas Co.* v. *Louisiana Light Co.,* 115 U. S. 650, the contract was one growing out of a grant of an exclusive right or franchise to supply gas to a municipality. The Court held that it was protected by the Constitution, and, in the course of the opinion delivered by MR. JUSTICE HARLAN, said: "The Constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of the public health, the public morals and the public safety, in the same sense and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations. Whatever therefore in the manufacture or distribution of gas in the city of New Orleans proves to be injurious to the public health, the public comfort or the public safety, may notwithstanding the exclusive grant to plaintiff, be pro-

hibited by legislation, or by municipal ordinance passed under legislative authority. It cannot be said with propriety, that to sustain that grant is to obstruct the State in the exercise of her power to provide for the public protection, health and safety. The article in the State Constitution of 1879 in relation to monopolies is not in any legal sense an exercise of the police power for the preservation of the public health, or the promotion of the public safety; for, the exclusiveness of a grant has no relation whatever to the public health, or to the public safety. These considerations depend upon the nature of the business or duty to which the grant relates, and not at all upon the inquiry whether a franchise is exercised by one rather than by many." In the more recent case of *Manigault* v. *Springs*, 199 U. S. 473, decided in 1905, the Court said: "It is the settled law of this Court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. * * * While the power is subject to limitations in certain cases, there is wide discretion on the part of the Legislature in determining what is and what is not necessary—a discretion which courts ordinarily will not interfere with. * * * It only remains to consider, in connection with this branch of the case, whether the Act of the General Assembly of 1903 was a proper exercise of the police power of the State. Of this we have no doubt. Although it was not an exercise of that power in its ordinarily accepted sense of protecting the health, lives and morals of the community. It is defensible in its broader meaning of providing for the general welfare of the

people, by the reclamation of swampy, overflowed and infertile lands, and the erection of dams, levees and dikes for that purpose." Turning now to the decisions in this State, it will be found that the decisions we have referred to have been frequently quoted, and the principles therein announced consistently applied. In the case of *State* v. *Broadbelt,* 89 Md. 565, where the Court was considering an Act prescribing certain sanitary regulations to be observed by dairymen who supplied milk to cities, CHIEF JUDGE McSHERRY, after stating that the rights of property were subject to the power of the Legislature to enact reasonable restraints and regulations in respect thereto, said: "This power, legitimately exercised, can neither be limited by contract nor bartered away by legislation." In *State* v. *Hyman,* 98 Md. 596, where the Court was passing upon the constitutionality of an Act providing that no room in any tenement or dwelling house should be used for the manufacture of coats, vests, trousers, etc., until a permit was obtained from the Chief of the Bureau of Industrial Statistics, the Court held, quoting from the syllabus, "It is a legitimate and important function of the State to make laws to preserve and protect the public health, morals and safety, and in regard to such laws the authority of the State is complete, unqualified and exclusive. This power can neither be limited by contract nor bartered away by legislation. It is for the Legislature to determine whether particular acts or things are or are not dangerous to the public health or safety. And if a statute designated to protect the public health has a real and substantial relation to this power of the State, the Courts will not hold it to be void merely because it is, in their judgment, unreasonable and unwise." In the case of *Byrne* v. *Md. Realty Co.,* 129 Md. 202, JUDGE BURKE, speaking for the Court, said: "All uses of property or courses of conduct which are injurious to the health, comfort, safety and welfare of society may be prohibited under the sovereign power of the State, even though the exercise of such power may result in inconven-

ience or loss to individuals. In this respect individual rights must be subordinate to the higher rights of the public. The power that the State may exercise in this regard is the overruling law of necessity, and is founded upon the maxim, *Salus populi est suprema lex.* The existence and exercise of this power is an essential attribute of sovereignty, and the establishment of government presupposes that the individual citizen surrenders all private rights to exercise which would prove hurtful to the citizens generally." In the case of *Yeatman* v. *Public Service Com.,* 126 Md. 513, where there was a contract to supply water to dwelling houses at a certain rate, and where it was claimed that an order of the Public Service Commission had the effect of impairing the obligation of that contract, JUDGE STOCKBRIDGE, speaking for the Court, said: "The true principle, which must control in a case like the present, is that laid down in *Manigault* v. *Spring,* 199 U. S. 473, in the following language: 'It is the settled law of this Court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.'"

The rule applicable to contracts relating to matters within the police power of the State, has been applied to contracts for hiring of convict labor. It is said in 12 *Corpus Juris,* 1001: "No contract can be made by the State for hiring convict labor which will deprive the State of its police power over convicts, and statutes, therefore, passed in exercise of the police power are not invalid as impairing the obligation of prior contracts," and it is said in 13 *Corpus Juris,* 927:

"But inasmuch as the State cannot surrender its police power over convicts, prison authorities cannot make contracts for convict labor which would preclude the Legislature from adopting another system necessarily interfering with the execution of such contracts, and contracts for convict labor must necessarily imply a right of the Legislature to change its policy in regard to the penal system, and the parties to such contracts must be presumed to know that such changes of policy may occur." In the case of *Hancock* v. *Ewing,* 55 Mo. 101, the Court said: "The question is whether the warden of the penitentiary, or the supervisors, called inspectors, or both, can make contracts for convict labor which will preclude the Legislature from adopting another system necessarily interfering with the execution of such contracts, and we are clearly of the opinion that this could not be done. Such contracts, it may be conceded, are warranted by the law, and seem in various instances to have been made and sanctioned by the Legislature, but all such contracts must necessarily imply a right on the part of the Legislature to change its policy in regard to the penal system. This is a necessary result of the peculiar character of such contracts. It may be that the Legislature will abolish the whole system and require solitary confinement without labor, as we know is the policy of some States, or it may happen that the number of convicts will not enable the warden to furnish the contractors with the number called for in the contract." In 71 Georgia, 301,* the Supreme Court of that State held that the constitutional restriction against impairing the obligation of a contract did not prevent the State from changing "its penitentiary system."

No one will deny that it is the duty of the State, in the exercise of its police power, to provide for the custody and maintenance of convicts as an essential part of the administration of criminal laws enacted for the protection of the

---

*Georgia Penitentiary Co.* v. *Nilms.*

public.  It would seem equally clear that regulations providing for the release of convicts from confinement in the prisons, and their employment in the open air outside of the penitentiary, under conditions that enable them to earn for their own benefit something beyond the cost of their maintenance, have a direct relation to the public welfare and public safety, the preservation of their health and the preservation of public morals.  It is the duty of the State to make all reasonable regulations for the preservation of their health, and the public have a direct interest in their moral and physical well-being.  The State can not, therefore, by contract or otherwise, barter away its duty and right to adopt such measures as it may, from time to time, deem advisable for the promotion of those ends.

It is alleged in the bill that the convicts were hired out to contractors and others for work outside of the penitentiary, for commercial and business purposes in order to obtain the increase in revenue therefrom, and the appellant contends that there is not the slightest ground for holding that the Acts referred to were "necessary for the public health, safety, morals or welfare, in the sense in which the police power may be used to override constitutional property and personal rights."  It relies upon the case of *B. & O. R. R. Co.* v. *Waters,* 105 Md. 396, where the Court held that the charter of the Baltimore and Ohio Railroad Company was not repealed by the Act of 1906, Chapter 457, and that the said Act was not a police regulation designed to protect the public health, safety or morals, but was enacted in the interest of property owners adjoining the line of the proposed lateral road.  But in that case JUDGE PEARCE quoted the statement of the Court in *Lochner* v. *New York,* 198 U. S. 45, that "The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is, or is not repugnant to the Constitution of the U. S. must be determined from the natural effect of such statutes, and not from their proclaimed purpose."  In the

case at bar the Acts in question were passed in reference to a matter clearly within the police power of the State. In the case of *State* v. *Hyman, supra*, CHIEF JUDGE Mc-SHERRY, speaking for the Court, said: "Running through all the cases, both Federal and State, is the doctrine that if the measure designed for, or purporting to concern, the protection or preservation of the public health, morals or safety, is one which has a *real and substantial relation to the police power*, then no matter how unreasonable or how unwise the measure itself may be, it is not for the judicial tribunals to avoid or vacate it upon those grounds. * * * If the Act has a real and substantial relation to the police power no inquiry as to its unreasonableness can arise, because it is the judgment of the law-makers and not of the Courts which must control; and if in the judgment of the former the thing be reasonable, all inquiry on that ground by the latter is foreclosed."

Upon the authorities referred to, and for the reasons stated, we hold that the Acts in question are not unconstitutional and void as impairing the obligation of the contract here sought to be enforced, and that the appellant is not entitled to a decree for specific performance of that contract to the extent of depriving the State Board of Prison Control of the power and authority vested in said board by said Acts, or to an injunction restraining said board from the further exercise of such power and authority.

In this view of the case it is not necessary to determine whether this is a suit against the State, or whether the Acts referred to amount to a naked breach or repudiation of the contract in question as distinguished from an impairment of the obligation thereof within the meaning of the Federal Constitution, or to consider the other questions discussed by counsel.

*Decree affirmed, with costs.*