You have requested our opinion regarding the sale of goods by Maryland Correctional Enterprises ("MCE"), previously known as State Use Industries (SUI),[1] to inmates within State correctional facilities. You state that the Division of Correction ("DOC") is contemplating an arrangement under which MCE would become the sole provider of apparel and textile goods to prison commissaries as a part of a contract with a private vendor that would centralize commissary operations. You ask to what extent sales to inmates at commissaries are governed by the State law that restricts sales of prison-made goods on the "open market."
In our opinion, while inmates participate in the "open market" to some degree, the purchase of an item in a commissary that is not open to the general public is not a transaction on the "open market." Moreover, the State law governing the sale of prison-made goods and services specifically allows sales on the "open market" for use by a State contractor in performing a contract with the State. Accordingly, prison-made goods may be sold to a commissary contractor for resale to inmates.
 I Statutory Framework
The General Assembly has established MCE as part of DOC to employ inmates to provide goods and services for sale to government agencies, certain non-profit organizations, and other limited classes of purchasers. See generally Annotated Code of Maryland, Correctional Services Article ("CS"), § 3-501 et seq.
MCE, which is expected to be financially self-supporting, is to provide "meaningful work experiences for inmates" to improve their employability after release. CS § 3-502(1), (2). MCE seeks to develop industries that provide "full-time work experience or rehabilitation programs for all eligible inmates." CS § 3-502(3). MCE is to operate prison industries "in an environment that resembles as closely as possible the environment of private sector business operations." CS § 3-502(4).
The MCE statute defines the structure of the program and its production methods. MCE may develop programs "to provide services or produce goods" for various governmental entities, including units of State government. CS § 3-511. Uniform standards for "quality, quantity, style, design, delivery, scheduling, and pricing" are established by the DOC and MCE after consulting with the Department of General Services ("DGS") and other entities. CS § 3-512. Inmates employed by MCE are paid at rates set by the Commissioner of Correction and Chief Executive Officer of MCE, "taking into consideration other wage payments and incentives in other programs." CS § 3-514. Units of State government are required to purchase from MCE the goods and services that it produces, provided that the price does not exceed the prevailing average market price as determined by DGS. CS § 3-515; see also
Annotated Code of Maryland, State Finance Procurement Article, §§ 14-102, 14-103(1) (requiring state agencies to buy "supplies and services" from MCE).
MCE is generally prohibited from selling goods and services on the "open market," subject to certain exceptions. The statute provides as follows:
 (a) Except as authorized under subsection (b) of this section, goods and services of Maryland Correctional Enterprises may not be sold on the open market.
 (b) Goods and services of Maryland Correctional Enterprises may be sold on the open market:
 (1) if they are produced or provided by an individual on parole or in a work release program;
 (2) if the sale is made to a charitable, civic, educational, fraternal, or religious agency, association, or institution for its own use and not for resale within 1 year of the purchase;
 (3) to a person for national defense purposes if not prohibited by an act of Congress;
 (4) if there are surplus goods remaining after meeting the forecasted requirements of State government and political subdivisions and the good remain unsold 1 year after being produced;
 (5) for use by a contractor or subcontractor in performance of a contract with a unit of State government or any other governmental unit in the State; or
 (6) as allowed under the Private Sector/Prison Industry Enhancement Certification Program of the United States Department of Justice, Bureau of Justice Assistance.
CS § 3-516. The statute does not define the phrase "open market."
 II Analysis
You ask whether the prohibition against sale of MCE goods on the "open market" would prevent MCE from contracting to supply apparel and other items to a private vendor for resale to inmates through prison commissaries.
A. Prison Labor and the Open Market
The use of prison labor has evolved during the history of the United States. See Garvey, Freeing Prisoners' Labor,
50 Stan. L. Rev. 339 (1998). Before the late 18th century, American jails were primarily places of confinement and various forms of punishment. Id. at 345-46. Towards the end of the 18th
century, states adopted prison reforms that employed the "discipline of hard labor" to displace the "idleness" believed to be source of criminal behavior. Id. at 346-48. In northern states, prison goods were produced in penitentiaries and sold on the open market. Id. at 348-53. In southern states, it became more common to lease prison labor to private merchants, thus producing income for both the state and private concerns. Id.
at 353-58.
The shift in focus from moral reform to profit resulted in various abuses. In addition, as organized labor's political influence grew, it also sought restrictions on the use of prison labor. Garvey, supra, at 360-62. The underlying concerns appeared to be the exploitation of inmates and the unfair competition faced by law-abiding workers. Id.; Hauck, PrisonLabor, 37 Harv. J. Legis. 279, 281-82 (Winter 2000). A compromise solution to the prison labor issue was the "state use system" under which "prisoners would still work, but the state would be the only buyer of their labor and the only market for their goods." Garvey, supra, at 362-63. During the Great Depression in the 1930's, Congress severely restricted the sale of prison-made goods.[2] "As a result, the state use system became the only real way of organizing prison labor." Id.
at 367.
As in other states, Maryland law at one time allowed for the contracting out of prison labor. See, e.g., Chapter 358, Laws of Maryland 1878 (authorizing prison managers to hire out able bodied male convicts to canal company). In 1916, the Legislature directed prison officials to replace the contract system of prison labor with one devoted to "State works." Chapter 556, § 630, Laws of Maryland 1916; see also Jones Hollow Ware Co. v.Crane, 134 Md. 103, 106 A. 274 (1919) (upholding abrogation of prison labor contract).
In 1937, the General Assembly limited the sale of prison-made goods to public or quasi-public agencies and explicitly forbade their sale to the "consuming public." Chapter 213, Laws of Maryland 1937. Later amendments to the statute expanded the market for prison-made goods to "any charitable, civic, educational, fraternal, or religious association, institution, or agency for its own use and not for resale to others"[3]
and, when permitted by federal law, to other tate governments and the federal government and to private entities for national defense purposes, but retained the prohibition against sales to the "consuming public." Chapter 123, Laws of Maryland 1962.
In 1981, the statute was significantly revised and recodified. Chapter 661, § 2, Laws of Maryland 1981. The prohibition against sales to the "consuming public" became a bar against sales "on the open market" subject to a number of exceptions: sales of goods produced by parolees or inmates on work release; sales to charitable and similar organizations; sales for purposes of national defense consistent with federal law; and sales of surplus goods that remained unsold for two years. See Annotated Code of Maryland, Article 27, § 681D (1982 Repl. Vol.). While the 1981 revision was chiefly intended to expand training opportunities for inmates and improve the financial footing of SUI, a position paper submitted by SUI listed a number of other concerns addressed by the bill including "protection for the private sector, so SUI will not create a hardship in any single area by dominating the market." SUI, The Need to Repeal andReplace Legislation on State Use Industries (revised February 18, 1981).
In 1984, the statute was amended to permit sales to a contractor or subcontractor for use in the performance of a contract with the State or other government entity. Chapter 154, Laws of Maryland 1984, now codified at CS § 3-516(b)(5). The purpose of this amendment, as explained by its proponents, was to "expand the market" for prison-made goods and thus increase employment of inmates by SUI. See Legislative File for House Bill 48 (1984). This was another exception to the general prohibition against sales on the "open market."[4]
B. Inmate Purchasers and the Open Market
An "open market" is typically conceived of as an arena in which any buyer or seller may freely exchange goods and services at prices that are ultimately determined by the competition in the market. See, e.g., Black's Law Dictionary (8th ed. 2004) at p. 989 ("a market in which any buyer or seller may trade and in which prices and product availability are determined by free competition"). As noted above, a precursor of CS § 3-516
conceived of such a market as one in which the "consuming public" may purchase goods and services.
Inmates are able to purchase items from the same merchants that members of the public patronize in that they can order items from mail order catalogs that DOC selects and screens for security. In that sense, the inmates participate as purchasers in the "open market." However, your question specifically concerns items sold through a prison commissary, an establishment that is not open to the general public.
C. Sale of Prison-Made Goods at Prison Commissaries
 1. Prison Commissaries
Inmates may purchase items such as toiletries, clothes, and snacks from the prison commissary. You state that, historically, each institution has employed a correctional supply officer who purchased products for resale to the inmate population at a 15% mark-up. Profits from these commissary sales become part of the "inmate welfare fund" at each institution that is devoted to a variety of purposes for the benefit of the general inmate population. See CS § 10-503(a)(2)(i); COMAR 12.11.09.02, .04.[5] Thus, as we understand it, commissary sales are limited to the inmates themselves and the proceeds of those sales, after allowance for expenses, are devoted to the benefit of the inmates at the institution.
2. Prison-Only Apparel
For several years, certain types of apparel produced by MCE have been "sold" to inmates through the commissaries. However, these transactions have been limited to approved items that may be obtained only through the commissary, that may be used only within the prison, and that must be surrendered when the inmate is released from confinement. These transactions appear to be more in the nature of rentals than sales. The acquisition and use of these items is restricted to individuals in confinement in Maryland, and there is only a single source for these items. In our view, these commissary transactions are not part of the "open market."
3. Sales to Private Commissary Operator for Resale to Inmates
You state that DOC contemplates contracting with a private vendor to centralize commissary operations. Under such a contract, MCE would serve as the sole provider of all apparel and textile goods, not just the prison-only apparel described above. You anticipate that this arrangement will result in increased levels of inmate employment consistent with MCE's mission.
The arrangement you describe involves the sale of prison-made goods at two levels: (1) to the contractor who obtains the contract to operate the prison commissaries and (2) to the inmates who buy those goods from the contractor at the prison.
In the first sale, MCE would sell prison-made goods to the private operator to enable it to perform its contract with DOC. This sale arguably takes place on the "open market" as, but for the terms of the contract between DOC and the contractor, the contractor ordinarily would have a choice of apparel suppliers. As noted above, however, the statute permits the sale of prison-made goods on the open market when the sale is "for use by a contractor or subcontractor in performance of a contract with a unit of State government or any other governmental unit in the State." CS § 35-16(b)(5). In this instance, the sale of prison-made apparel is for the contractor's use in carrying out its contract to operate the prison commissaries.
In the second sale, a prison-made good is sold by the commissary contractor to an inmate. While it is true that an inmate might purchase similar items on the open market through a mail order catalog or by commissioning a friend or relative to make a purchase, the commissary itself is not open to the general public. Rather, it is a market located within a State institution that offers a limited range of items solely to incarcerated individuals whose basic personal needs are largely a State responsibility. Cf. Harker v. State Use Industries,990 F.2d 131, 133 (4th Cir. 1993), cert. denied, 510 U.S. 886
(distinguishing SUI inmate workers from other employees in outside industries on the basis that DOC provides them with food, shelter, and clothing).
As noted above, the statute restricting sales of prison-made goods originally forbade sales to the "consuming public." The term "open market" was substituted in the 1981 revision of the statute, but there is no indication in the legislative history that this was intended to further limit the sale of prison-made goods. Rather, the revision incorporated and elaborated upon prior exceptions to the ban on sales to the public.
The arrangement you describe appears consistent with the underlying purposes of the limitations on sales of prison goods and with MCE's statutory authority and mission. Assuming that inmates are fully involved in the production, sale and distribution of apparel to the contractor, the contract would presumably support MCE's statutory charge to provide meaningful work experience for inmates to assist with their rehabilitation. The net proceeds of commissary sales are to inure to the benefit of the inmates themselves. Given that sales would be limited to the prison population rather than the "consuming public," there is little likelihood that MCE would threaten to "dominate the market" in any particular item. Thus, the sale of MCE-made apparel to an inmate at a commissary would not transgress the prohibition against sales on the "open market."
 III Conclusion
For the reasons set forth above, the purchase of an item from a prison commissary that is not open to the general public is not a transaction on the "open market" and therefore is not prohibited by CS § 3-516. Moreover, because that statute specifically allows sales on the "open market" for use by a State contractor in performing a contract with the State, prison-made goods may be sold to a State contractor in connection with the contractor's operation of a prison commissary.
J. Joseph Curran, Jr. Attorney General
Mark J. Davis Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] Chapter 124, Laws of Maryland 2005, effective October 1, 2005, replaced the name State Use Industries with Maryland Correctional Enterprises.
[2] See Hawes-Cooper Act, 45 Stat. 1084 (1929) (divesting prison-made goods of interstate character, thereby allowing a state to prohibit importation of another state's prison products); Ashurst-Sumners Act, Pub.L. No. 74-215, 49 Stat. 494
(1935), codified at 18 U.S.C. §§ 1761-62 (making interstate transportation and sale of prison-made goods a federal crime); Walsh-Healey Act, Pub.L. No. 74-846, 49 Stat. 2036 (1936),codified at 41 U.S.C. § 35 (largely forbidding federal contractors from using prison labor).
[3] The statute was also amended to permit the retail sale of "articles of handicraft" made by inmates for the account of the inmates. See Chapter 123, Laws of Maryland 1962.
[4] In 1991, a sixth exception was added to permit the sale of Maryland prison-made goods as part of the federal Prison Industry Enhancement Certification Program. See Chapter 422, Laws of Maryland 1991, now codified at CS § 3-516(b)(6). That program is designed to allow the use of prison labor by private contractors in certain circumstances. See Hauck, PrisonLabor, 37 Harv. J. Legis. 279 (Winter 2000).
[5] The General Assembly appropriates money from each inmate welfare fund in the annual State operating budget for the benefit of the institution's inmates. See, e.g., Chapter 443, Laws of Maryland 2005 at p. 2224; Department of Budget and Management, FY 2006 Budget-Volume Two, pp. 650-52 (appropriations from inmate welfare funds at Maryland House of Correction and other inmate welfare funds at Jessup institutions). *Page 64