**ELLIOTT v. UNITED STATES.**

(District Court, D. Maine. November 16, 1926.)

No. 36.

1. **Words and phrases—To "amortize" means to destroy, kill, or deaden.**

To "amortize" means to destroy, kill, or deaden.

2. **Internal revenue ⬅➡7(17)—"Amortization" of value of war structures or vessels means deduction equal to depreciation in book value from termination of war (Revenue Act 1918, § 214, subd. a [9], being Comp. St. § 6336⅛g).**

Under Revenue Act 1918, § 214, subd. a (9), being Comp. St. § 6336⅛g, amortizing a reasonable deduction for income tax purposes for amortization in case of structures or vessels built for and contributing to the prosecution of the war, "amortization" means a deduction equal to the depreciation in book value resulting from termination of the war.

3. **Evidence ⬅➡574—Department rule, fixing arbitrary tonnage value for vessels, cannot be followed by court, as against testimony of competent witnesses.**

A department rule, fixing an arbitrary tonnage post-war value for vessels for amortiza-

tion purposes, cannot be followed by a court as against testimony of competent witnesses.

**4. Internal revenue ☞7(17)—Owners of vessel contracted for before, but not built until after, the Armistice, held entitled to amortization (Revenue Act 1918, § 214, subd. a [9], being Comp. St. § 6336⅛g).**

A vessel, building of which was contracted for in May, 1918, but which was not built until after the Armistice, and was then put in service under jurisdiction of the Shipping Board before the peace treaty, held constructed for transportation of articles contributing to the prosecution of the war, and within the amortization provision of Revenue Act 1918, § 214, subd. a (9), being Comp. St. § 6336⅛g.

At Law. Action by Arthur J. Elliott against the United States. Judgment for plaintiff.

Hale & Dorr, of Boston, Mass. (Richard W. Hale, of Boston, Mass., of counsel), for plaintiff.

William B. Nulty, Asst. U. S. Atty., of Portland, Me.

HALE, District Judge. The petitioner, a resident of Thomaston, Me., brings this petition under the Tucker Act (24 Stat. 505), authorizing him to sue the United States to recover back income taxes paid in 1919 for 1918, and in 1920 for 1919, upon his shares in three wooden vessels, namely ⁷/₆₄ of the schooner Margaret Throop, of 1,800 tons dead weight capacity, ¹/₆₄ of the barkentine Cecil P. Stewart, of 1,800 tons, ²/₆₄ of the barkentine Reine Marie Stewart, of·2,000 tons. He claims amortization upon each of these ships under section 214, subd. a (9) of the Revenue Act of 1918, passed by Congress February 24, 1919 (Comp. St. § 6336⅛g). The section is as follows:

"In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous acts of Congress as a deduction in computing net income. At any time within three years after the termination of the present war, the Commissioner may, and at the request of the taxpayer shall, re-examine the return, and if he then finds as a result of an appraisal or from oth-

er evidence that the deduction originally allowed was incorrect, the taxes imposed by this title and by title III for the year or years affected shall be redetermined; and the amount of tax due upon such redetermination, if any, shall be paid upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 252."

The clear object of the statute is to relieve a man from being taxed upon his ships, in case he has had no actual income from them after setting off his losses.

[1, 2] Amortization has not been dealt with much in the courts. The lexicographers hold it to mean "the sum paid * * * toward the extinction of a liability." The best defination I find is in Montgomery, Income Tax Procedure, 1922, as follows:

"To amortize means 'to destroy; kill; deaden.' Therefore a reasonable deduction for amortization means a deduction sufficient to destroy or kill or deaden the values on the books which represent plant or equipment used for war purposes. If the effective or usable value has disappeared entirely, the book value must be entirely killed (amortized). If the effective or usable value has only partly disappeared, the book must be killed (amortized) to an extent which will leave a remaining book value representing only the actual worth of the asset."

In the Congressional Record of February 17, 1919, is found a statement made in the discussion of the 1918 act, before its passage, and which shows the concurrent understanding of the word's meaning:

"If by reason of the investment of his profits in an extension of his yards, the ship owner has constructed a plant which was necessary in time of war to meet the demands which were made upon him at that time for production, but which after the termination of the war has depreciated in value because not needed; in that case under the amortization provisions he will be allowed to amortize to the full extent of the depreciation in value."

The questions now before this court are whether the ships of the petitioner come within the act; and, if they do, what amortization is to be allowed upon each ship. It appears that the Commissioner allowed, in principle, the petitioner's claim in reference to the Margaret Throop and the Cecil P. Stewart, but denied it as to the barkentine Reine Marie Stewart, and the petitioner now seeks, first, to obtain a larger amount of amortization than was allowed by the Commissioner on the first two vessels; and, sec-

ond, to establish liability, and fix the amount of amortization, on the barkentine Reine Marie Stewart.

It will be seen that, in amortizing the cost of shipping, the act directs that the cost of construction be compared with what has come to be called the "post-war residual value," namely, the value to which the vessels had sunk when we consider them as assets after the war, in the period of three years from March 3, 1921, called the "post-war period"; for the date of the termination of the war is fixed by the statute of March 3, 1921 (Comp. St. § 3115¹⁴/₁₅f), as follows:

"In the interpretation of any provision relating to the duration or date of the termination of the present war or of the present or existing emergency, meaning thereby the war between the Imperial German government and the Imperial and Royal Austro-Hungarian government and the government and people of the United States, in any acts of Congress, joint resolutions, or proclamations of the President containing provisions contingent upon the duration or the date of the termination of such war or of such present or existing emergency, the date when this resolution becomes effective shall be construed and treated as the date of the termination of the war or of the present or existing emergency, notwithstanding any provision in any act of Congress or joint resolution providing any other mode of determining the date of such termination."

The petitioner offered testimony tending to prove his claim relating both to values and to liability. No testimony was offered by the government. Upon the subject of values the petitioner qualified as an expert, and placed the residual value of the ships, during the post-war period, at $7.50 per ton, in the case of each ship. He testified to the sale of his own fractional interest in the Margaret Throop at $5.50 per ton in August, 1924, at which time the other fractional interests of the managing owners were also sold, and the management of the vessel changed. August, 1924, is outisde of the post-war period, but close enough to it to be material and relevant. The petitioner called an expert of long standing in local shipping matters, who placed sailing ship values as being, early in the post-war period, $10 per ton, and at the end of the period nothing. In his opinion, at the end of the period they had become valueless, or a liability.

No testimony was offered tending to show that values had changed between the end of the period and the sale by the petitioner.

The above figures tend to show, by average, a post-war residual value of $5.00. The expert testified to six purchases which he regarded as comparable, the purchases having been made by him all early in 1922, at prices which ran from $3.76 to $6.20 per ton.

The earning power of the vessels in question is relevant and material, as tending to show their value or lack of value. The evidence in the case was that during the post-war period, and up to the present date, such vessels as the three in question had no earning power. The petitioner testified that none of the three had made any actual net earnings in the post-war period; nor had any of the other vessels operated by his firm. The other expert testified that none of the vessels with which he was familiar earned anything during the post-war period, and that he had practical experience, by reason of his purchase of a considerable number of vessels, and that experience brought him to the conclusion that, at the end of the period, lack of value was established by lack of possible profits.

[3] While the government offered no evidence touching the value of the ships in question, it brought before me a standing rule giving an estimated sales value of $20 per dead weight ton. This is the rule:

"The computation approved by the unit for finding the residual value of wooden sailing vessels is, when briefly stated, the averaging of the depreciated, post-war replacement cost with the capitalized net earnings for the years 1921 to 1923, inclusive, or, in the absence of net income, substituting an estimated sales value of $20 a dead weight ton."

This rule of the department may be a convenient one for the government, and properly used under many circumstances; but the court cannot observe this rule, when challenged by the testimony of competent witnesses. The government offered no testimony and introduced no evidence of replacement value. The petitioner offered as part of the proofs the testimony of Mr. Hall, a man of great maritime experience, who has often been before me, and whom I have found very useful in passing upon the value of shipping.

By a fair preponderance of all the evidence, I find that the fair market value—namely what is called the "post-war residual value"—of the petitioner's interest in each of the vessels in question in the post-war period, was $7.50 per dead weight ton.

I find that the cost of the petitioner's shares in the vessels in question, their post-war values, the difference between the two and the years when the costs were incurred, and in which therefore the loss is to be ap-

plied to amortize such costs are shown in the following schedule which I have adopted from a table prepared by the learned counsel for the petitioner, and which I find to fairly present the facts, as shown in evidence:

|  | Margaret Throop. | Cecil P. Stewart. | Reine M. Stewart. |
|---|---|---|---|
| 1. Dead weight tonnage | 1,800 | 1,800 | 2,000 |
| 2. Fraction owned by petitioner .......... | 7/64 | 1/64 | 2/64 |
| 3. Cost to petitioner.... | $17,500.00 | $3,125.00 | $5,937.80 |
| 4. Dead weight tons owned by petitioner | 196.875 | 28.125 | 62.5 |
| 5. Cost per ton to petitioner .............. | $ 88.89 | $ 111.11 | $ 95.00 |
| 6. Year in which cost was incurred....... | 1918 | 1919 | 1919 |
| 7. Post-war value per ton ................. | $ 7.50 | $ 7.50 | $ 7.50 |
| 8. Amount amortizable per ton............. | $ 81.39 | $ 103.61 | $ 87.50 |
| 9. Amount amortizable for share of petitioner .............. | $16,023.66 | $2,914.03 | $5,468.75 |
| 10. Amount of amortization previously allowed ............... | $ 8,059.84 | $1,742.66 | 0.00 |
| 11. Balance now to be allowed ........... | $ 7,963.82 | $1,171.37 | $5,468.75 |
| 12. Taxable year into which allowance falls ............... | 1918 | 1919 | 1919 |

By the statute, the difference is the amount which the petitioner may claim as amortization. I understand that counsel, when the case was on trial before me, substantially agreed that the departmental rule is that amortization is to be allowed under circumstances like these in the year in which the cost occurred, and the year is found for that purpose.

[4] Another question now before me is whether the Reine Marie Stewart was a war vessel within the meaning of the amortization statute, namely, whether she was a vessel "constructed for the transportation of articles contributing to the prosecution of the present war." From the testimony I find the following facts:

The agreement between the owners and shipyard for the building of this barkentine was made on May 11, 1918. This was the day when the Margaret Throop was launched; the owners of shares in her were present for the launching, and able to consult about ordering another vessel. The frame, keel, stem, and materials of the barkentine were, soon after May 11, 1918, contracted for by the shipyard; but, as the yard had only a single set of ways, it could not lay the keel of the barkentine until the Cecil P. Stewart was off the ways. On May 11, 1918, when the ship was contracted to be built, there was no reason to believe that the war would end before she would be in service. It is material and relevant to remember that it was June, 1918, before the Germans reached the extreme of their advance against the Allies at Chateau Thierry, and July 18, 1918, before vessels were conscripted by the Shipping Act passed on that day. When the Armistice came, on November 11, 1918, there was nothing, in my opinion, in the shipping business which would make it a wise policy for shipbuilders to stop construction. The keel of the barkentine was laid in February, 1919, and the shipping business was then in substantially the same condition. She was launched and put in service in November, 1919. Even then it was not wise to stop construction, in my opinion. The end of the war came on March 3, 1921, a year after her first voyage.

In the statute under which amortization is claimed, passed February 24, 1919, the situation then existing was spoken of as "the present war." The Reine Marie Stewart was built to be, and was in fact, placed in service under the jurisdiction of the Shipping Board.

Under the Act of Congress of July 18, 1918, c. 157, 40 Statutes at Large, p. 913 (Barnes' Code, § 10155 [Comp. St. §§ 3115¹/₁₆f–3115¹/₁₆kk]), called the Shipping Act, the President issued a proclamation on July 29, 1918; by this proclamation he delegated his powers to the Shipping Board. There is no substantial difference between this Shipping Act and the amortization statute, namely, the words "constructed for the transportation of articles contributing to the prosecution of the present war" mean substantially the same as the language of the Shipping Act. The following is the passage from the Shipping Act which provides for the conscription of vessels (as printed in Barnes, § 10155, it is headed, "Regulation and Control of Water Transportation; Docks, Wharves and Terminal Facilities"):

"The President shall have power to prescribe the order of priority in which goods shall be carried or other services performed by any vessel of the United States and to specify goods which shall be carried or to direct the voyage or employment of any such vessel and to make such rules, regulations, and orders, with respect to any such vessel, relating to the loading, discharging, lighterage, or storage of goods, or the procurement of bunker fuel, or any other matter relating to the receiving, handling, transporting, storing, or delivering of goods, as may in his judgment be necessary and proper for the efficient utilization of transportation facilities and the effective conduct of the war."

The power to delegate follows: "The President may exercise the power and authority hereby vested in him through such agency or agencies as he shall determine from time to time."

The war cargoes upon which the Margaret Throop was conceded by the Commissioner to be a war facility, and to come under the amortization section, were coal, manganese, and lubricating oil. The Cecil P. Stewart was likewise conceded to be a war facility. Her only cargo under the Shipping Act was one of oil, carried in 1919. The first cargo of the Reine Marie Stewart was carried in January, 1920; that is, before the repeal of the Shipping Act, and while ships were still conscripted and limited to voyages "necessary and proper for the effective conduct of the war." That vessel's cargo was coal, and was carried under a charter approved by the Shipping Board, pursuant to the Shipping Act and the President's proclamation under it.

I am constrained to come to the conclusion that the Reine Marie Stewart was "constructed for the transportation of articles contributing to the prosecution of the present war."

All the vessels in question belong to a class of sailing ships common along this coast. They were found very helpful in the prosecution of the war and profitable under the exceptional conditions of the war. When the war was over their value was over.

The amortization statute presented a *useful* method of reaching the result that a taxpayer might be prevented from being taxed upon his vessels when it was found that he had no substantial income from them. Whether the act presented a way of reaching this result which was *new*, as well as useful, I am not certain; for the general principles of the Income Tax Act seem to have been intended to afford some relief without the application of the amortization provisions. The government wisely decided to provide directly for a situation such as is presented in the case at bar.

I think it clear that the petitioner has sustained the burden of proof, and has shown that his vessels sank in value to the extent found by the evidence in this case, and stated by me in this opinion.

The learned counsel for both parties in the instant case have agreed that, after my findings of fact shall have become available with reference to the post-war residual tonnage value, and upon the further question whether the Reine Marie Stewart was a proper subject for amortization, they will enter into a stipulation as follows:

(1) What additional deduction from income is allowable to the petitioner.

(2) At what rate the income balanced by this deduction is to be taxed.

(3) When the tax upon such income was paid.

(4) Its amount.

(5) The consequent amount for which a judgment is to be entered for the tax of each year, and for interest thereon to the day of judgment.

I request that such stipulation may be filed not later than November 24. When it is filed, judgment is to be entered accordingly.

If counsel require any further order of court, let application be made at once.