## KELLY–SPRINGFIELD TIRE CO. et al. v. UNITED STATES.
### No. 6982.

Circuit Court of Appeals, Third Circuit.
Feb. 15, 1940.

Moses & Singer, of New York City, S. Leo Ruslander, of Pittsburgh, Pa., and Harrison B. McCawley, of Washington, D. C. (Morgan S. Kaufman, of Scranton, Pa., and Herman G. Kopald, of New York City, of counsel), for appellants.

James W. Morris, Asst. Atty. Gen., and Sewall Key, Warren F. Wattles, and Carlton Fox, Sp. Assts. to the Atty. Gen., for appellee.

Before BIGGS, CLARK, and JONES, Circuit Judges.

CLARK, Circuit Judge.

In these sad days one does not have to stress the price of glory. Even in the narrow financial field of the case at bar that price has been exceedingly high. A Senate

Finance Committee Report estimates it at $400,000,000 in tax refunds, 74th Cong. 2nd Sess. Senate Report 2337, p. 17. This diminution in revenue has, perversely, occurred as a result of a statute enacted to finance our national activities in World War No. 1. It reads: "In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. * · * *" Revenue Act of 1918, § 234(a) (8), 40 Stat. 1077.

We say as a result of the statute—we should rather say as a result of administrative and judicial activity and inactivity in its interpretation. For that interpretation, such as it is, has proceeded for more than twenty years in at least partial disregard of one of the salient standards by which the application of the statute is limited.

█ The standard is subjective, and is inherent in the wording of the measure. The deduction is not allowed on the cost of "facilities for the production of articles contributing to the prosecution of the present war, constructed, erected, etc.". The prepositional phrase follows and so modifies the participles "constructed, erected, installed or acquired". Verbs denote action and when that action is by a person it reflects the mental processes of the actor. "For", as used in the statute, can only describe those processes. Accordingly, both the courts and the Board have on occasion measured the applicability of the statute in terms of the taxpayer's state of mind, see Merchants Transfer & Storage Co. v. Burnet, 4 Cir., 49 F.2d 56; Id., 17 B. T. A. 290, and cases there cited. So, too, the grammatically analogous phrase "transactions entered into for profit" (occurring in a cognate[1] section of the statute) has received a like construction. Paul, Motive and Intent in Federal Taxation, Selected Studies in Federal Taxation, Second Series, p. 280.

The word "for" does not, of course, define the requisite state of mind with controlling precision. Need the corporate taxpayer merely construct war-suited facilities intentionally during the war period, or must it do so with a motive of constructing such facilities "for the prosecution of the present war"? In Weir v. Commissioner, 3 Cir., 109 F.2d 996, we recently undertook a similar inquiry into the meaning of "for" as used in the "for profit" section above cited. Though the legislative history of that enactment was inconclusive, we were able with the assistance of a clear cut declaration of statutory intendment by the Supreme Court to deduce that mere intention and not motive was requisite. Here, we think the opposite is true, and that motive not intention is the criterion. This variance is necessitated by the peculiar and distinctive purpose of the statute at bar, a purpose amply evidenced by its legislative history.

That history is perfectly plain. It appears succinctly in the introductory statement of the Chairman of the House Committee on Ways and Means which framed the bill, Mr. Kitchin: "We allow them now to make deductions for depreciation and depletion, as in the case of mines and oil and gas wells. I think the amortization provision will apply largely to corporations that will go into making real war material for the government. Take ferromanganese, for example. The War Trade Board has been appealing to different individuals and corporations to make it. One man came to me and said 'I am willing to put $200,000 in a plant to produce it, but the war might end at any time, and my contract would then end, and although I might make $50,000 or more the first year I would have $200,000 invested in a plant that would be worthless. I would lose on the transaction, and therefore can not afford to put up or expand my plant unless I can be sure of a reasonable amortization provision'. The amortization provision is intended mostly to take care of cases of that kind. The departments dealing in war contracts are very anxious that we should incorporate such a provision in this bill."

---

[1] Revenue Act of 1918, § 214 (a) (5). This relates to the deductions allowed individuals. Section 214 (a) (9) following repeats verbatim the statute under construction.

56 Cong.Rec., Part 12 (Appendix p. 666), September 6, 1918. A leading tax expert's contemporary summary is in much the same vein: "After our entry into the war an abnormal activity took place. Men actuated by patriotic motives and disregarding sound business judgment entered upon extended enlargement of plants, or the creation of new plants, in order to supply the needs of the country. Production was encouraged everywhere. It was evident that demand for the articles produced would cease or materially diminish when the war ended. Costs were abnormally high and their ordinary effect on business was ignored. Speed was the essence, and adding to the high costs due to inflation were the bonuses for prompt delivery, extra overtime pay and extra charges for rapid transportation. A further deterrent to expansion was the abnormally high war-profits tax. Under ordinary conditions the cost of plant and equipment would be charged off over the useful life of the property. But such conduct would have been ruinous in the case of those who put up plants for the specific purpose of assisting in the carrying on of the war. It was necessary, therefore, to allow the extraordinary cost of special plants and facilities to be charged against the income produced by the extraordinary effort which necessitated their construction before assessing an abnormally high war tax." Holmes, Loss as a Factor in the Determination of Income, Columbia University Lectures, The Federal Income Tax, 137, pp. 154, 155.

See, also, 57 Cong.Rec. Pt. 1, p. 549; 65th Cong., 2nd Sess., House Report 767, p. 10; 65th Cong., 2nd Sess., Senate Report 617, pp. 7, 8; Hearings before the Senate Committee on Finance, 65th Cong., 2nd Sess., on H.R. 12863, Pt. 2, pp. 3-18; Klein, Federal Income Taxation, pp. 670, 671. In addition a sort of ex post facto legislative history may be gathered from the proceedings of the Select Senate Committee (Couzens Committee) which investigated the Bureau of Internal Revenue in 1925. According to its Report: " * * it is obvious that the purpose of this provision was to stimulate the production of articles contributing to the prosecution of the war by encouraging the construction, erection, installation, and acquisition of the facilities required for that purpose * * It was manifestly the purpose of Congress to deny this privilege with respect to facilities which had been acquired prior to our entrance into the war for the purpose of participating in the huge profits being realized from the manufacture and sale of articles to the Allies." 69th Cong., 1st Sess., Senate Report 27, p. 135.

Finally, insofar as regards the broader aspects of tax policy and economy, it is reassuring to notice the role assigned to amortization in recent congressional grapplings with the problem of war revenues. All agree that the crux of that problem is the stimulation of production in the face of high taxation, inflated costs, and apprehended peacetime obsolescence. As the Special Senate Committee (Nye Committee) on the Investigation of the Munitions Industry puts it: " * * * However, during wartime, when the erection of new plants and additions to plants is vitally necessary to furnish the needed increased production called for by wartime demands, amortization takes on added significance. If some return on investment is necessary to secure expansion of industry, it is clear that some assurance that the investment itself will not be lost must also be furnished. And the mere fact that war calls for new facilities indicates that without the war demand those facilities may be useless. The prospect of tax avoidance increases industry's natural wartime demand for liberal amortization allowances and the Government's desire to encourage expanded production conflicts with its need of revenue." 74th Cong., 1st Sess., Senate Report 944, Pt. 2, p. 30. See, also, 74th Cong., 2nd Sess., Senate Report 2337, p. 16.

The sources above quoted and cited make quite clear the object of the amortization section. Its aim was to quicken the industrial pulse of a country then undergoing the crisis of war. Stimulation was necessary because industrialists, however patriotic, must be reluctant to subject the capital entrusted to them to the evils of over-expansion—either in the creation of war specialties, or in the stepped-up production of goods suited to war and peace alike. Such reluctance is, by definition, a state of mind; and that state of mind, by hypothesis, is repugnant to an unaltered pre-war resolve to increase the pre-war output of "war facilities". Hence, what is demanded of the taxpayer is a purpose of wartime, not pre-war, expansion. That purpose, furthermore, falls into the category of motive rather than intent. For wartime expansion may be

intentional though reluctant. But it cannot be motivated by factors giving rise to a pre-war desire for identical expansion, and still be reluctant. So an accurate elimination of the mischief sought to be remedied by the amortization provision (reluctance to expand) can only be achieved by inquiry into the taxpayer's motive.

Let us then examine the "motive" of this plaintiff-appellant. In doing so, we assume the validity of several findings on which the former opinion of this court seems to have been based.[2] That a certain violence inheres in that assumption appears, we may say, from the most cursory reading thereof. A comparison of the language of these findings with the Record discloses that they are a fairly close transcription of the testimony of the witness Brown (see Record, pp. 170–216), a former vice president of the appellant company. They hardly, therefore, come within the rule of judicial notice. If they did, we should seriously question extending the rule to include the mental state of a democracy faced with the cataclysm of a World War. In those days, Dr. Gallup was still in short pants and our own poor judicial notice would indicate an election won on the premise of keeping us out of war. The cases certainly go no further than to notice a public sentiment implemented by some official manifestation such as an election. See Jones Hollow Ware Co. v. Crane, 134 Md. 103, 106 A. 274, 3 A.L.R. 1658; 20 Am.Jur. § 63, p. 84, and § 64, p. 86; 15 Iowa Law Review 210.

Leaving psychology for facts, what do we find? We may say at the outset that we do not commend the form of the record on the first appeal. The case was tried in the District in January and February, 1933. It was decided in February, 1934. The appeal was taken and allowed the following April. Thereupon the testimony seems to have been abandoned and instead a series of 46 special findings of fact and conclusions of law as adopted by the court were filed. They are to some extent internally inconsistent, and contain exceptions on which an appellate court cannot pass because of the absence of the actual evidence. These handicaps do not, in our judgment, justify this court's earlier lack of concern (Kelly-Springfield Tire Co. v. U. S., 3 Cir., 81 F.2d 533) with the learned trial judge's discussion of the legislative intent (conclusions Nos. 43, 44, 45 and 46) and with his findings of fact. Obviously in the entire absence of any testimony, it should have been bound by the latter. At any rate, those findings (First Record, pp. 27–70) again before us in the instant appeal (Record, pp. 97–136) present this picture.

The plaintiff-appellant, Kelly-Springfield Tire Company, a New Jersey corporation, an automobile tire manufacturing company, grew out of an earlier organization, the Consolidated Rubber Tire Company, a New Jersey corporation (incorporated April 15, 1899). In its growth it acquired the stock of the Kelly-Springfield Company, a New York corporation, in 1911. The combined corporations had plants in Buffalo, New York, and Akron and Wooster, Ohio. Soon (November 16, 1915) after their merger, the minutes show: "An extended discussion took place regarding the necessity for building a new factory for the Company, and it was the opinion of all those present that a new factory should be built to meet the increasing demand for the output of the Company, and that same should be located away from Akron." Defendant's Exhibit D–11

In pursuance of this opinion, and in the spring of 1916, plaintiff-appellant entered into negotiations with the city of Cum-

---

[2] They read:
"* * * things in general were in a turmoil, due to activities resulting from the Mexican Invasion and the general talk that the United States was going to enter the World War." Finding No. 16, Record, p. 105.

"* * * For sometime prior to November 4, 1916, feeling ran high in this country, and became more and more sympathetic toward the allied cause, and on November 4, 1916, it was not unreasonable to assume that this country would enter the war on the side of the allies." Finding No. 34, Record, p. 116.

"* * * 30 to 60 days before the official declaration of war the plaintiff through its agents or officers believed that this country was going into the war, and there was no question but that the official declaration of war stimulated plaintiff's desire to go ahead. * * *" Finding No. 23, Record, p. 109.

"* * * the plaintiff considered that the Armistice was no assurance that the country would not continue in war, and while it was a temporary breathing spell, it threw the plaintiff into a quandary as to what might happen in the future." Finding No. 28, Record, p. 113.

berland, Maryland, and on November 4, 1916, made a contract with the by then incorporated boosters of that flourishing municipality, the Cumberland Development Company. The contract in substance provided, on the part of the tire company, for the location of its only future plant at Cumberland and for the employ of 3,000 men, within two years. On the side of the development company a site for the plant, a cash payment, $750,000, certain railroad and street rearrangements, were offered. Plaintiff-appellant's own engineering staff estimated a plant of the size indicated to cost $2,500,000. As soon as outside experts who were to supervise the actual work (S. Diescher & Sons) were consulted that estimate was increased by some $2,000,000. This last estimate was made on January 18, 1917. The decision to begin physical construction was made on April 2, 1917, and ground was accordingly broken on April 11, 1917 (five days after the declaration of war). The War Industries Board, however, refused to allow any supply of structural steel for the enterprise, and the plant was not finally completed until June, 1923, at a cost of $13,951,351.90 (largest annual expenditure, $8,135,309.17, in 1920).

 ·This chronicle leaves the case a very simple one. A tire manufacturing company needs new plants to replace its old ones. The product may be said to be used in the prosecution of the war—though one wonders how far the causal chain extends. Would it include, for instance, the moving picture theatres where the soldier truck drivers are entertained? It decides to build and starts by following the. common practice of obtaining an indirect municipal subsidy. Its own engineers make what in other fields is called a preliminary report and estimate a certain cost. The engineers consulted on the matter of actual construction must, as their profession requires, be more careful, and their estimate is much higher. The directors considered this increased cost from January 18th, 1917, to April 2nd, 1917, four days before the declaration of war, and then decided to go ahead anyhow and, incidentally, not to breach their contract with the development company. Now the need for plant expansion is based on a profitable market. That profitable market must, however, be calculated on the most economical plant unit. That unit in the tire business seems to be the full capacity one. At any rate, the calculation of the principal case was so made. The factor of construction cost in the calculation may shift depending upon the accuracy of the estimate (first, $2,500,000, then $4,880,550; actual (postwar) cost, $13,951,351.90). The factor of capacity is static and is determined at the time of the original calculation. Any change in probability of use of capacity must be irrelevant to that original calculation and hence to that original need. That destroys plaintiff's argument bottomed upon an increased demand at the time of the second or increased cost estimate of S. Diescher & Sons. Its motive then remains the fulfillment of its need for an indubitably (1916) pre-war increased output of tires.

We have no hesitancy, accordingly, in expressly overruling the prior decision of a majority of this court which declared the Cumberland plant amortizable, Higgins v. California Prune & Apricot Growers Inc., 2 Cir., 3 F.2d 896, 898, and cases there cited. Inasmuch, however, as that decision necessitated a great deal of further study on the part of the learned trial judge we are glad to record our approval of his second judgment now appealed from. For to withhold approval is to sanction as a "reasonable" amortization allowance on the Cumberland plant triple the monstrously unreasonable amount which has already been allowed.

On April 14, 1927, someone in the office of the General Counsel of the Bureau of Internal Revenue discussed plaintiff-appellant's allowance with an engineer of the Amortization Section of that Bureau. As the latter puts it: " * * * the engineer was advised that in determining the amortization allowance in this case, the amortizable costs should be confined to actual facilities acquired and commitments made for actual facilities between April 6, 1917 and November 12, 1918, and that the allowance should be computed on such costs on the basis of the loss that would have occurred if the plan of building the factory had been abandoned on November 12, 1918." Plaintiff's Exhibit F (attached to the complaint), p. 3.

This the engineer did. He found the total costs incurred in the prescribed period to be, $1,014,142.29 (more than half of them did not ripen into expenditures until 1919 or 1920). Then, by recourse to salvage values (in most cases nil) and by estimating cancellation fees on undelivered

machinery (generally about 50% of cost) he fixed the loss on the imaginary catastrophe of abandonment at $682,044.99, which amount was allowed in toto by the Commissioner, and formed the major basis of a refund of $599,888.54, plus $315,869.53 interest. Plaintiff's Exhibit G (attached to the complaint).

▆▆▆▆ The major monstrosity of this episode lies in the false pretense that a going concern perfectly adapted to peacetime uses has been abandoned as a wartime white elephant. Such a game of make-believe not only perverts the common sense of the statute but also runs counter to all the authorities, see, generally, Holmes, Federal Taxes, 6th Ed., p. 1081 et seq.; Klein, Federal Income Taxation, p. 670 et seq., above cited; Kohler, Income Taxes 1927, p. 180 et seq.; 4 Prentice Hall 1939 Fed.Tax.Service, para. 51,963 et seq.; Foulke, The Federal Income Tax, § 1075 et seq. As is apparent from the excerpts quoted in the preceding portion of our opinion, the problem is one of fixing the loss apportionable to the anticipated shrinkage from wartime costs to "normal" peacetime values. See, also, Holmes, Federal Taxes, 6th Ed., p. 1081, above cited. When, therefore, facilities are continued in use after the war, the loss to be measured is not the loss which would have occurred if they had been abandoned, because that loss is mitigated in rough proportion to the extent the facility is continued in use. To hold otherwise would put an abandoned or idle ferromanganese plant on a parity with, say, an at least partially thriving automobile factory. But the former has only scrap value, whereas the latter has going concern value. So the Regulations measure the allowance on "permanently discarded" facilities in terms of "fair market"—under the circumstances, scrap—value, Reg. 45, Art. 184(1), Reg. 62, Art. 184 (1), and on unabandoned facilities in terms of "loss of use", Reg. 45, Art. 184(2), Reg. 62, Art. 184(2). Loss of use is ordinarily computed according to the capacity-production formula, that is, the ratio between wartime capacity and peacetime production.[3] If, however, in extreme cases, the capacity-production ratio results in an allowance so large as to exceed cost less sale or salvage value, or so small as not to exceed cost less replacement cost, sale or salvage value or replacement cost, respectively, measure the deduction. Here, because of the post-war improvements in the manufacturing process, peacetime production was actually greater than planned wartime capacity.[4] Hence, the only possible measure of loss was replacement cost. That cost (as the learned district judge found with respect to much the same facilities as were passed upon by the Commissioner) is 83% of war cost. Thus, the Regulations applied with strict liberality would have allowed a deduction of about 17% of cost instead of the 70% which was actually granted by ignoring them. So the allowance we are called upon to triple is itself quadruple the probable maximum under the Regulations. And it is much more so if certain minor monstrosities are taken into consideration, as, for example, the failure to reckon what portion of the Cumberland plant cost represented replacement of the other plant facilities—facilities which were in fact abandoned, and on which an allowance of some $150,000 was also granted.

Nevertheless, plaintiff-appellant imagined it had lost even more than $682,044.99 in its fantasy of abandonment, and launched the instant proceeding. The learned district judge, however, unlike the Commissioner, felt himself bound by the Regulations. Reducing the conceded total of expenditures made between April 6, 1917, and March 3, 1921, by their conceded replacement cost, he arrived at a total allowance of $1,930,681.54—17% of cost. This amount was then spread over the tax years 1918 to 1922, in proportion to the expenditures made in those years, resulting in a deduction of but $71,963.64 for 1918. The spread was in accordance with the Regulations, Reg. 62, Art. 185, and with the decisions of this court, McKeesport Tin Plate Co. v. Heiner, D.C., 4 F.Supp. 245, affirmed, 3 Cir., 77 F.2d 756, and of the Court of Claims, Sloss-Sheffield Steel & Iron Co. v. U. S., 9 F.Supp. 611. We observe that

---

3 Though not expressly provided for by Regulation, the use of this formula has met with judicial approval. See United States v. Briggs Mfg. Co., 2 Cir., 40 F. 2d 425; Ashland Mining Co. v. U. S., Ct.Cl., 56 F.2d 466; Diamond Alkali Co. v. Heiner, 3 Cir., 60 F.2d 505, reversed on other grounds, 288 U.S. 502 53 S.Ct. 413, 77 L.Ed. 921.

4 Additional Finding No. 47, Record, p. 154, based inter alia on the testimony of the witness Biddle, plaintiff-appellant's cost accountant, Record, p. 291.

plaintiff-appellant was given the benefit of the doubt as to whether costs incurred after the Armistice but before the technical termination of the war (March 3, 1921) are amortizable. Generally, that is a distinction reserved for ships which "prosecuted" the war by bringing home men and materials from Europe after the Armistice. See Elliott v. U. S., D.C., 16 F.2d 164. However that may be, the spread required by the Regulations is plainly reasonable. Expenditures in 1920 when there was no need for war production bear little or no relation to the ability to pay in 1918. Finally, we are not impressed by plaintiff's plea of hardship in that the statute of limitations bars its use of the allowance as spread over the years after 1918. The same statute bars further action on the indefensible refund of some $900,000 in 1928. It should know ten times too much of a "good" thing when it gets it.

The judgment of the District Court is affirmed.