## PITTSBURGH CAN CO. v. UNITED STATES.
### No. 7272.

Circuit Court of Appeals, Third Circuit.

June 29, 1940.

Samuel Kaufman, and S. Leo Ruslander, both of Pittsburgh, Pa., for appellant.

George Mashank, U. S. Atty., and Elliott W. Finkel, Asst. U. S. Atty., both of Pittsburgh, Pa., Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, and Lester L. Gibson, Sp. Assts. to Atty. Gen., for the United States.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

By coincidence this is the third case arising out of World War No. 1 considered by this Court at this term. That war spread to the United States, disrupted inter alia industrial conditions and so afforded an opportunity for abnormal profits. In one case [1] we held that those profits may have "disappointed" the United States but had not "deluded" them in the sense of the rule permitting relief. In another [2] we did not permit a manufacturing company to ascribe its expansion to patriotism and so minimize

---

[1] United States v. Bethlehem Steel Corp., et al., 3 Cir., 113 F.2d 301, filed June 18, 1940.

[2] Kelly-Springfield Tire Co. v. United States, 3 Cir., 110 F.2d 823.

its tax liability for excess profits. In the case at bar we are upholding the right and intention of the Congress to enlarge the limitation period for the very same tax. The facts are largely chronological and can be stated almost in the form of a time-table. The elapsed time, twenty-three years, is, we may observe, rather staggering.

The appellant taxpayer filed its return of income and profits taxes for the year 1917 on March 30, 1918. That return calculated the tax due and owing at $1,937.37 and that amount was paid on June 14, 1918. In January 1921 the Commissioner of Internal Revenue assessed an additional $237.-03 and the taxpayer paid it on February 21, 1921. On September 14, 1922, a revenue agent recommended the assessment of further amounts to the taxpayer and its parent the Enameled Metals Company. The two taxpayers "principal and subsidiary" met this blow by a request "accompanied by affidavits" for an allowance for invested capital. The matter turned on the nominal rental paid for valuable land occupied by the appellant taxpayer and owned by a company supplying it.

On February 14, 1923, appellant taxpayer filed the standard waiver or consent agreement (Exhibit A), 5 Paul & Mertens §§ 50.39, 50.40. This waiver expired (was limited to) March 15, 1924, and on March 4 of that year, i. e., just under the wire— the Commissioner followed the procedure prescribed for cases where he believes "the usual methods may result in failure of ultimate collection" and imposed a jeopardy assessment (jeopardized by delay) (Exhibit B), 5 Paul & Mertens §§ 42.85, 42.86. This assessment was in the amount of $14,000.94 or about seven times the sum estimated and paid by the taxpayer. Its payment was demanded on March 23, 1924. Instead of paying the taxpayer filed a claim in abatement on March 31, 1924 (Exhibit C). Thereafter letters were written, more affidavits filed (January 12, 1925), and interviews with Treasury officials had. In the outcome appellant taxpayer achieved a partial success and received a certificate of overassessment (Exhibit D) in the amount of $4,977.55 on June 2, 1926.

While all this was going on, the United States Supreme Court exposed a curious legal misapprehension of the Treasury. It had been thought there that the five year limitation of the Revenue Act related solely to action in court and had no application to steps short of such war. The officials

therefore concluded that after an assessment a distraint could be undertaken at any time and of course at great leisure. This exceedingly slothful view was first doubted by the courts in the case of Seaman v. Bowers, 2 Cir., 297 F. 371, promulgated two days (March 17, 1924) after the expiration of the waiver extending the five year period in the principal case. This first doubt was, as often, by way of dictum. Stronger medicine was to come, and on February 13, 1925 the district court in the same circuit followed that dictum, New York & Albany Lighterage Co. v. Bowers, 4 F.2d 604, and was affirmed in so doing successively by the Circuit Court of Appeals, Bowers v. New York & Albany Lighterage Co., 2 Cir., 10 F.2d 1017, and the Supreme Court, Bowers v. New York & Albany Lighterage Co., 273 U.S. 346, 47 S.Ct. 389, 71 L.Ed. 676, on February 1, 1926, and February 21, 1927 respectively.

Faced with this embarrassment the Treasury fell back to prepared positions and contended that § 278(d) of the Revenue Act of 1924, 26 U.S.C.A.Int.Rev.Acts, page 60, permitting collection of a tax within six years of assessment, applied retroactively. Such a contention had been made and sustained by the Fifth Circuit Court of Appeals in the case of United States v. Russell, 22 F.2d 249, filed November 4, 1927. In order that this question might be finally adjudicated, an additional general waiver limited to one year and dated September 12, 1927 (Exhibit E), was signed and filed. That waiver was not standard and general but on the contrary was modified by a rider reserving to the taxpayer full rights to establish any time limitation it could and only sparing him the annoyance of a distraint the Collector otherwise might have been inclined to make. This waiver and rider were renewed in haec verba on September 12, 1928, to expire on December 31, 1929 (Exhibit F). On January 2, 1929, the United States Supreme Court filed its decision in the Russell case and so cut off the last opportunity for the Treasury to repair its original mistake of law, Russell v. United States, 278 U.S. 181, 49 S.Ct. 121, 73 L.Ed. 255. On September 9, 1929, the waiver and rider (Exhibit G) were renewed in haec verba to expire September 31, 1930.

Upon the expiration of this last waiver and rider and on January 8, 1930, the Collector demanded payment of the original assessment less the amount allowed in abatement. This was paid on January 16,

1930, by check and conceded credits (Exhibit H). The payment being accompanied by adequate indication of protest, a claim for refund was filed on February 17, 1931 (Exhibit K), and rejected on July 27 of the same year (Exhibit L).

On September 26, 1933 appellant taxpayer filed its petition against the United States under the Tucker Act, 28 U.S.C.A. § 41(20). This petition was answered on May 1, 1935. On November 6, 1936, the case was tried, largely on stipulation before a district judge, as the Tucker Act requires. On August 11, 1939, the learned district judge filed his opinion, the findings of fact and conclusions of law appropriate thereto, and entered judgment in favor of the United States. On January 26 and February 6, 1940, the proper appeal papers were filed. The case was argued in this court on April 16, 1940, twenty-three years after the taxpayer earned the profits on which it should or should not be taxed.

The appeal is based on two contentions. We take up the more, in our opinion, serious one first. We have seen the revenue officials' mistake of law. The Congress saw it too and did not like what they saw; with them to perceive was to prevent. Accordingly they enacted § 611 of the Revenue Act of 1928.[3] At first this legislation met with a cool reception in the "inferior" federal courts.[4] These tribunals seem to have approved the arguments of those who opposed the original passage of the bill.[5] Their view was really one of hostility to any retroactive repeal of a limitation statute. The Congress was sufficiently impressed by this plea to attempt a justification. They found it in the theory that the revenue officials were misled into a generous postponement by their desire to consider the merits of claims in abatement. The fact was of course that the Treasury was self-deceived by their misconception of law previously adverted to. This assumption of the necessity for apology led to some confusion of expression both in the Congress and in the courts.[6]

This first took the form of technical interpretation of the word "stayed" as used in the statute. An element of compulsion was interpolated, United States v. Burden, Smith & Co., 5 Cir., 33 F.2d 229, 230. Gradually the Circuit Courts of Appeals, and finally the Supreme Court, abandoned the legalistic and adopted the etymological meaning of "postponed" or "delayed", Regla Coal Co. v. Bowers, D.C., 37 F.2d 373; Graham & Foster v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415;[7] and see also 3 Words & Phrases, Fourth Series, Stay, page 551. As we see it the appellant taxpayer wants to cling to another emanation of this abandoned meaning. The claim in abatement was filed 15 days after the five-year limitation had expired. Thinking in terms of legal rights and liabilities, he asserts the impossibility of staying something that is no longer there. A like assertion convinced one learned district judge, Neuland v. Bowers, D.C., 38 F.2d 842. It does not convince us and it has not convinced other courts. Many of the authorities are collected in 5 Paul & Mertens, § 51.36, and in note 50 (p. 413) to 26 U.S.C.A.Int.Rev. Code, § 3770, and many of them are cited in the respective briefs.[8]

---

3 "If any internal revenue tax (or any interest, penalty, additional amount, or addition to such tax) was, within the period of limitation properly applicable thereto, assessed prior to June 2, 1924, and if a claim in abatement was filed, with or without bond, and if the collection of any part thereof was stayed, then the payment of such part (made before or within one year after the enactment of this Act) shall not be considered as an overpayment under the provisions of section 607, relating to payments made after the expiration of the period of limitation on assessment and collection." 26 U.S.C.A. Int.Rev.Acts, page 461.

4 Clinton Iron & Steel Co. v. Heiner, D.C., 30 F.2d 542; Diamond Alkali Co. v. Heiner, D.C., 39 F.2d 643; cf. American Glue Co. v. United States, D.C., 42 F.2d 235.

5 Brief of Harrison Tweed, Hearings before Committee on Ways and Means, House of Representatives (1927), p. 565; Brief of James Walton, Hearings before Senate Finance Committee (1928), p. 57.

6 Hearings before Committee on Ways and Means, House of Representatives (1927); Hearings before Senate Finance Committee (1928); cf. Report on Bill HR. 5904 to validate collections of Internal Revenue taxes stayed by requests or claims for credit and for other purposes, 73d Sess. (1933) Report 202.

7 Graham & Foster v. Goodcell, supra, discussed in 31 Columbia Law Review 1041.

8 See expressly, Vanderlip v. United States, Ct.Cl., 6 F.Supp. 965; Moyle v. United States, Ct.Cl., 22 F.Supp. 432; Century Electric Co. v. United States, 8 Cir., 75 F.2d 589; National Paper Products Co. v. United States, 9 Cir., 109 F. 2d 583.

The flaw seems to lie in a straining in favor of "law Latin" and against plain English. This straining proceeds, as we have indicated, from some notion of hardship. That notion of hardship proceeds in its turn from a sentimental but illogical analysis of the purposes of statutes of limitation. Those statutes confer no vested rights.[9] They are ex gratia to the individual to protect him from perjury and they benefit the public by accelerating litigation. There is no unfairness in retrospectively removing something that was only a shield.[10] As was said by a Supreme Court Justice a good many years ago: "* * * No man promises to pay money with any view to being released from that obligation by lapse of time. It violates no right of his, therefore, when the legislature says time shall be no bar, though such was the law when the contract was made." Campbell v. Holt, 115 U.S. 620, 628, 6 S.Ct. 209, 213, 29 L.Ed. 483. This is particularly so where the kindness is double. The United States first waives its immunity from suit and then requires promptness on the part of its officials, Wyman, Partridge & Co. v. United States, Ct.Cl., 41 F.2d 886.

Surely if it seems in the public interest, the United States may forgive those officials for their lack of diligence and collect taxes admittedly due but jeopardized by that lack. We think that is just what the United States, speaking through the Congress, has done. The report of their conference committee expressly says so, the exact words being: "The House bill (sec. 611) provided that in cases in which a tax was assessed within the period of limitation upon assessments and thereafter (whether before or after the expiration of such period). * * *" Conference Report, No. 1882, 70th Cong., 1st Sess., Amendment No. 190, p. 22. We believe that references in other parts of the Report and elsewhere in the Debates to "reliance" by the Commissioner and Collectors on the abatement claim, stem from a policy of appeasement to persons who believed that official carelessness or mistake had brought about their escape from the taxes they justly owed.

This brings us to the construction of the waiver of September 9, 1929 and its accompanying rider. The cases say, as they must, that the search here is for "intention".[11] The assurance of the revenue is so important that taxpayers are constrained to pay first and complain afterwards. The Collector could then distrain at any time. All the riders protect him against any invidious consequences which might follow that forbearance. One of those consequences is the one-year limitation of § 611.[12] We see no occasion for its particularization. Further, the reason for the taxpayer's reservation, whether good or bad, timely or untimely, is separate from and quite irrelevant to the provision affecting the other party, the Collector. The idleness of the former's gesture affects it alone.

The judgment of the District Court is affirmed.

---

[9] 19 American and English Ency. of Law (2d Ed.), Limitation of Actions, p. 171; 37 C.J. p. 695; cf. Link v. Receivers of Seaboard Air Line Ry. Co., 4 Cir., 73 F.2d 149.

[10] An interesting discussion of § 611 and sec. 612 in this aspect is to be found in The Barth Case and Revival of Income Tax Claims by Retroactive Repeal of Limitations, 8 North Carolina Law Review 179; Schulman, The Constitutionality of Section 611 in the Light of Its Remedial Purpose (Part I), The National Income Tax Magazine, February 1930, p. 52.

[11] 5 Paul & Mertens § 50.52; Lowell Cotton Mills v. Grissom, D.C., 59 F.2d 461; Charlton Woolen Co. v. White, D. C., 27 F.Supp. 371.

[12] Regla Coal Co. v. Bowers, D.C., 37 F.2d 373.